## THE LOUISIANA.

### HARTY v. CROMWELL S. S. CO. et al.

(Circuit Court of Appeals, Fifth Circuit. May 5, 1896.)

### No. 396.

1. SHIPPING—INJURY TO STEVEDORE—OPEN HATCH.

A stevedore going into the between-decks, in the daytime, pursuant to the orders of the foreman in charge, fell down an unguarded hatchway, which was lighted by a port six feet square, a hatch eight feet square, and four deadlights. It was not customary on that vessel, or any other vessel coming into the port, to keep any railing about the hatch, and the preponderance of the evidence showed that it was usual to leave the hatchway uncovered until the hold was fully stored. *Held*, that the accident was due to the stevedore's own negligence, and the vessel was not liable.

2. SAME—NEGLIGENCE OF FELLOW SERVANTS.

Where a stevedore engaged in discharging cargo fell through an unguarded hatchway in the between-decks, *held*, that if there was any obligation to have the hatchway closed, the duty of opening and closing it when necessary rested upon the squad of laborers working in the between-decks, who were the stevedore's fellow servants, and the ship was not liable.

3. SAME—WHO ARE FELLOW SERVANTS—FOREMAN.

An under-foreman (called the third foreman) in charge of a squad of stevedore's laborers, is their fellow servant as to any injury occurring to one of them through his negligence. Railroad Co. v. Baugh, 13 Sup. Ct. 914, 149 U. S. 368, followed.

Appeal from the Circuit Court of the United States for the Eastern District of Louisiana.

This was a libel in rem by Patrick Harty against the steamship Louisiana, of which the Cromwell Steamship Company and E. V. Gager, master, were claimants, to recover damages for personal injuries. The district court dismissed the libel, and the libelant appealed.

Bernard Titche and O. B. Sansum, for appellant.

J. P. Blair, for appellees.

Before PARDEE and McCORMICK, Circuit Judges, and SPEER, District Judge.

SPEER, District Judge. The libelant, Patrick Harty, was, on the 19th day of September, 1892, employed as a laborer in discharging a cargo from the steamship Louisiana, belonging to the defendant company. The steamship at that time was moored at the foot of St. Louis street, in the city of New Orleans. While so engaged, the libelant was ordered by the foreman in charge to proceed to the aft part of the vessel between-decks, and complying with this direction he fell through an open hatchway into the hold of the vessel, as stated in the libel, from 25 to 30 feet, and as a result of the fall he received severe injuries to his back, arms, legs, and other portions of his body, and was, it is stated, for the time, completely paralyzed. He was confined, it is alleged, to his bed, for a period of five months, and during more than three months of this time was helpless. It is alleged that he received perma-

nent injuries to his spine, and other injuries which incapacitated him from the performance of ordinary manual labor, and, besides, suffered great bodily pain and distress of mind. He is now, he states, unable to perform any laborious work. He charges that his injury was occasioned by the negligence of the defendant company, in that the hatchway was left uncovered, and it was a dark compartment, with no guard, railing, or rope inclosing it; and that these precautions should have been provided to prevent employés from falling down the hatchway. He states that he did not see the hatchway, and could not see it. His damages are alleged to be $10,000.

Edward V. Gager, as claimant, answers the libel. In the answer it is stated that libelant was employed in discharging the cargo as he alleged, and that it was his duty to work in all parts of the vessel, wherever there was freight to be loaded or unloaded, and he had there regularly and frequently worked. On the date of the accident the squad to which libelant belonged was directed to the aft part of the vessel, known as "between-decks," to discharge a part of the cargo; that the libelant did not go with the rest of the party, as was his duty, but slipped off to a neighboring coffee house for a drink, and was slipping back again, when he fell into the open hatchway. This was the result of his own carelessness, and, moreover, he did not fall 25 or 30 feet, but about 7 feet, to the ship's shaft alley, and rolled off from there, and fell about 6 feet to the ship's floor; that his injuries were very slight, and were merely bruises; that the libelant has grossly exaggerated both the character of his injuries and their effect. It is denied that the libelant is unable to do laborious work, and it is averred that if the libelant has done no work since his illness it is due to the hope of gain by means of this suit, and to the fact that the owners of the steamship Louisiana, in a spirit of humanity, but not by reason of any legal obligation, regularly paid to said libelant, from the date of his injuries to June 29, 1893, all the wages he would have earned had he performed his regular work during that period, the wages amounting to the sum of $280.55; that the payments were discontinued because it became evident that the libelant was shamming disability, and had grossly exaggerated the nature and extent of his injuries. It is further alleged that the means of ingress and egress of said compartments where the libelant fell were safe for laborers or others using ordinary care. The hatchway was open because it was always open while the vessel was being loaded or unloaded; that no guard, railing, or rope is customary around a hatchway so situated, nor is it necessary for reasonable safety; that the light was sufficient for the safety of any one using ordinary care; that the libelant was fully aware of the existence and location of the hatchway and of the fact that there had never been any guard or railing about it; that the ship was without negligence; and that the injuries resulted from a risk incident to his employment; and, besides, if it should be ascertained that there was fault or negligence on the part of any other than the libelant, it was the negligence of the libelant's fellow

servants, for which he cannot recover. After the hearing in the district court the libel was dismissed at libelant's cost, and this appeal was taken.

It is generally true, in cases of this character, that there is apparently an irreconcilable conflict in the testimony submitted to the consideration of the court. This case is not exceptional in that respect. Mr. Harty himself testifies as follows: "We were ordered down between-decks to carry out pipes, and I was going in there with some men for those pipes. One of those colored men was with me,—I don't know which,—and I says, 'Don't come down here. I am falling into some hatch here;'" and while thus expressing his solicitude for his companion Mr. Harty continued his downward flight. The ambulance was sent for, and came in charge of medical advisers, who were spoken of in the evidence as "students." These gentlemen at once prescribed a glass of whisky for the patient. He denies that he took it, but a preponderance of evidence indicates that he did. The students then said there was nothing the matter with him. He refused to go to the hospital, but in charge of a friend he was taken to his home in a carriage, and declined to accept the assistance of his attendant to put him to bed. On his examination as a witness he stated that he had been engaged in his then employment for nine years, and until that day he had never been in the aft part of the ship, and in fact had never been on the ship at all during that entire period. When asked as to the lights in the aft compartment, he said: "It was dark, sir. You couldn't see anything there. It would take you a full half hour to see anything there." A number of witnesses contradicted Mr. Harty as to the material facts upon which his charge of negligence by the defendant company is based. Witnesses Baker, Conway, Turley, and Lepeyre constitute the board of marine surveyors for the port of New Orleans. They inspected the compartment between-decks of the steamship Louisiana under conditions practically identical with those which existed when Harty was injured. They were familiar with the steamship. They made measurements of the compartment. They described the apertures admitting light thereto. They showed that the compartment was lighted by a port six feet square and a hatch eight feet square and by four deadlights. The witness Baker testified that, although an elderly man, with his glasses he could, with the same light, and with ordinary ease, read a newspaper at the hatchway down which Harty fell. The other witnesses testified to substantially the same facts. Witnesses for the libelant, indeed, did not all agree with Mr. Harty as to the almost impenetrable darkness which existed in that compartment. It is, on the contrary, manifest that there was light enough for the work to be done, and to secure the safety of the stevedore's laborers accustomed to work on the vessel. Nor is the charge of negligence based upon the absence of a guard or railing around this hatchway justified, nor is the fact that the hatchway itself was uncovered evidence of negligence. All the witnesses for the claimant mentioned, and others, testified that such hatchways between-decks are never pro-

tected by a rail or guard. Many of the witnesses were familiar with shipping, and several of them had been masters of vessels for a number of years. No such guard or railing for such a hatchway has been used on the Louisiana or on any other similar vessel coming to this port. Nor was the fact that the hatch was open under such circumstances unusual. The preponderance of testimony indicates that it was usual to leave the hatchway uncovered until the hold to which it gave access had been fully stored.

On the whole we are of the opinion that libelant has shown no right whatever to recover damages for such injuries as he may have sustained. If he carelessly walked into the hatchway, it was his misfortune, and not the fault of the respondent. Many witnesses testified that Harty had, during the long period of his employment, worked in all the compartments, indifferently, of the Louisiana, stowing and discharging cargo; and in view of this testimony it is impossible for us to credit his statement that his work was restricted to the wharves, or that he worked exclusively in the forward compartments, and never entered between-decks aft. Mr. Harty's case is very similar to that of the libelant in Re Sir Garnet Wolseley, 41 Fed. 896, where a night watchman undertook to sit down upon a hatch on the main deck, assuming the hatch cover to be on, and without looking to see whether the cover was on or not, and fell backward into the hold. In this case so experienced an admiralty jurist as Judge Benedict held that there was no right to recover, and the libel was dismissed. In the case of The Jersey City, 46 Fed. 134, decided by Judge Brown in the district court for the Southern district of New York, the libelant, like Harty, was a stevedore. On leaving his work, he fell down the hatchway, and claimed that the hatch was not covered, and that lights were not maintained about the opening. The evidence showed that it was not customary to cover the hatchway until the cargo was in, and the open hatchway was known to libelant. The libel was dismissed upon the ground that the libelant's fall was due to his own negligence. In this case the libelant fell at midnight. Mr. Harty fell in the daytime. It is, moreover, apparent that the duty of covering and uncovering the hatchway, whenever that was necessary, rested upon the squad of laborers who happened to be work ing between-decks, and they were fellow servants of Harty. Murphy v. Rubber Co. (Mass.) 34 N. E. 268. Therefore, in any event, he could not recover. If it be, as insisted, that this squad was under the control of the foreman, Marigny, still the rule would be applicable, for Marigny was an under-foreman,—a third foreman, as he is called,—and is to be treated as the fellow servant of the laborer. This is clear upon the authority of Railroad Co. v. Baugh, 149 U. S. 368, 13 Sup. Ct. 914; and this, moreover, is not a question of local, but rather of general, law, and is not to be determined merely by the decisions of the courts of the state, but by a reference to all of the authorities, and the consideration of principles underlying the relations of master and servant. Id.

Finally, we are able to conclude that Harty's injuries are happily not so severe as he deemed them to be at the time of the accident, and, indeed, when the libel was filed. It is true that on examina-

tion he said, "I thought I was dead." And when asked, "Where were you injured?" he replied, "The spine of my back;" "internally hurted; inside, sir;" and when his counsel, not content with this statement, put the further question, "When I say hurt, I do not only mean what pained you, but where were you injured?" Mr. Harty gave the emphatic, but not strictly responsive, reply, "Well, when the doctor came to me that evening, I was laying in bed, and you could hear me holler three or four blocks away with the agony I was in." It seems, however, that these injuries were either temporary, or that they existed more in Mr. Harty's imagination than in his sturdy physique, for, when further asked, "Do you still suffer any from the effects of those injuries?" he replied, "Yes, sir; when I am walking the streets there comes a sting right in the spine of my back." Fortunately this does not seem alarming. Dr. F. W. Parham, who, it appears from the evidence, is a physician of learning and experience, and besides gives his testimony in such manner that it is intelligible to those who have not his scientific acquirements, made a thorough physical examination of the libelant. He states that his general appearance was that of a man in very vigorous health. He was stout beyond the weight which he should have for his height, and appeared to be in a very vigorous condition. "I stripped him," the doctor said, "and took a view of the spinal column, to see whether the spinous processes or the vertebræ were all in line. I found they were. I then examined by touch to see whether there was any specially tender spot. Of course, I had to rely very largely upon what he told me as to whether there was much tenderness or not. He said that I hurt him during the examination, but I was unable to satisfy myself that I did, because he seemed to have as much pain on slight pressure as he did on deep pressure, so that I felt very doubtful about it. I found no displacement of the vertebræ, nor any sign of previous displacement occurring at the time of his injury, which he said took place in December. I did not find any positive evidence of permanent injury of any kind. The result of my examination points to the existence of soundness. If there had been any serious injury at the time, it was of a temporary nature, and, so far as my examination extended, it had disappeared." The witness stated further as to tests for tenderness: "I made the test by deep pressure along the spinal column. He said that hurt him. I then tried gentle rubbing of the skin, and he said that hurt him also. But the evidence of that character is subjective. That is what we call what is stated by the patient himself. The objective signs of damage were not sufficient to state any damage whatever." It is true that Mr. Harty was suffering from hernia, but it is not at all certain that the fall occasioned that trouble, and the physician stated that he thought it very improbable. The fact that the Cromwell Steamship Company paid Harty his wages during the several months of his supposed illness is not, as it is insisted, an admission that its officers felt responsible for his injuries, but is merely an evidence of the humane and kindly consideration of that company for its injured employés. We are satisfied that the decree of the court below was altogether correct, and it is affirmed.