## THE SUSQUEHANNA.

### (District Court, E. D. New York. January 15, 1910.)

SHIPPING (§ 84*)—INJURY TO STEVEDORE—CONTRIBUTORY NEGLIGENCE.

Libelant was foreman of a gang of stevedores, who were coaling a vessel, and on returning to the vessel after dark after an absence he jumped from a temporary gangway, which they had constructed for their work, into an open hatchway, and was injured. The ship had furnished lights which had been placed by the stevedores, who had full charge of that portion of the deck, but the hatchway was in the shadow. The hatch was not in use at the time, and whether the cover had been removed by one of the stevedores or by a seaman was left in doubt by the evidence; but neither libelant nor any officer of the ship had ordered it removed. *Held*, that in either event libelant did not exercise reasonable care in jumping onto a dark part of the deck, where he knew there were hatches, without examination, and that he was not entitled to recover from the vessel for his injury.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 189, 190; Dec. Dig. § 84;* Master and Servant, Cent. Dig. § 734.]

Suit in admiralty by Eugenio Fortuna against the steamship Susquehanna. Decree dismissing libel.

Convers & Kirlin (J. Parker Kirlin and John M. Woolsey, of counsel), for the Susquehanna.

Jackson, Hollander & Frank (Eugene L. Parodi and Samuel F. Frank, of counsel), for libelant.

CHATFIELD, District Judge. The libelant was the foreman of a gang of stevedores, who at the time of the accident were engaged in loading the steamer Susquehanna with a supply of coal, upon the 15th day of February, 1904. This steamer had what is known as a "cross-bunker hatch" in its bridge deck leading down to the space in which the coal for consumption was carried, and along each side of the · house upon the bridge deck were three side hatches, which, according to the testimony, were usually made use of, or at least the one in question was made use of, to trim and completely load the coal in the appropriate bunkers, after the space into which the cross-bunker hatch led had been filled. In order to dump the coal into this cross-bunker hatch, a gangway or elevated platform had to be built from the side of the vessel to a spot over the hatch, upon which wheelbarrows could be run; the coal having been raised from the lighter by buckets, which were emptied into the wheelbarrows at the side of the vessel. This gangway was about four feet above the deck so as to clear the rail and other obstructions, and the building of this temporary structure compelled

the removal of a pinnace or boat which was ordinarily suspended
from davits and rested upon supports near the rail of the vessel, out-
side of the particular side hatch through which the libelant fell upon
the day in question.

The libelant's testimony is that he was compelled to leave the ship
about half past 4 o'clock in the afternoon of that day to get a gang-
wayman in place of one who had gone home; that when he returned
it was dusk or nearly dark; that the lights had been arranged for the
continuation of the coaling which was to go on through the night; but
that the lighter in which the supply of coal had been brought alongside
of the vessel was empty at the point where the buckets were being
lowered; and that he took the hawser or line of the lighter and pro-
ceeded forward along the bridge deck of the Susquehanna, in order to
pull the lighter forward, so as to bring another portion of her cargo
within the range of the buckets for loading. As he did this, he
climbed up on the elevated gangway or path for the wheelbarrows
and jumped down upon the other side, immediately into and through
the side hatch, which proved to be uncovered at that time. He sus-
tained some injury by this fall.

His testimony and that of all the other witnesses satisfactorily shows
that the exact location of this small hatchway was at that time within
the dark radius caused by the shadows of the gangway and other
structures in the neighborhood. Plenty of lights had been supplied by
the ship, and the arrangement of these lights was entirely under the di-
rection of the stevedores, of whom the injured man was foreman.
The gangway itself had been built by the stevedores, out of materials
which they procured on the ship or dock, and the conditions of this
gangway were entirely within the control of the libelant.

In the same way the use of the hatches and of the different portions
of the vessel and its machinery necessary for the loading of coal were
under the direction of the stevedores, although it is apparent from the
testimony of both sides that some officer of the ship, usually one of
its engineering force, was on duty the greater part of the time, so as
to see that the machinery of the vessel was available.

The testimony of the ship's officers is to the effect that the accident
occurred somewhat later in the evening than the libelant fixes as the
time when he fell, and the testimony of these various officers of the ship
shows some confusion on their part as to whether the vessel had been
coaling earlier in the day or upon the previous night. A considerable
portion of their testimony about the matters as to which they were
questioned is either hearsay or generalizations from customs and sit-
uations usually prevailing. If, however, the testimony of the claim-
ant's witnesses who had any knowledge of the actual transactions be
believed, no officer of the ship or no person connected with the ship
for any explicit or authorized work had been near the hatch cover in
question, and it may be assumed to be established from the testimony
as a proposition of law that the control of the decks and hatches, so
far as their use by the stevedoring gang was concerned, belonged to
the foreman of the stevedores, and that the ship was not responsible
for any carelessness or negligence on the part of the stevedores them-
selves with respect to one another. Further, according to the testi-

mony of all the witnesses, the hatchway in question was not required to be open at the time of the accident, inasmuch as the cross-bunker hatch was still being used for the loading of the coal, and no necessities of the vessel or her crew called for anything in connection with the small hatch through which the libelant fell. It is argued from this that the presumption is that it had been opened by some of the stevedores themselves.

Upon such a state of facts, no negligence against the vessel or on the part of any one for whose acts the vessel was responsible could be predicated. But the libelant presents certain testimony showing that the small hatch cover in question, which was substantially made and sufficient in every way for the purpose for which it was used, had been taken off by a sailor, or a man doing some painting, clothed as a sailor, on the afternoon in question, while the foreman of the stevedoring gang was ashore looking for his new gangwayman. Two witnesses were produced by the libelant who testify about the actions of this sailor. The first one, a coal passer, says that the sailor removed the hatch in order to protect some fresh paint, at about 5 o'clock in the afternoon, and that the witness said in Italian, "Don't touch the hatch, don't touch the hatch," and also said, "Don't take it away, because some one might fall down." This stevedore could not talk English to any extent, and, when making these remarks, called to the son of the libelant, whom he designated as "Frank," and Frank talked to the seaman. This witness, Schiano, also testifies that the libelant fell down the hatch soon after he got back and before there was any opportunity to warn him. The libelant's son, Frank, is shown by this testimony to have also known that the hatch cover in question was off the hatch, and was himself called as a witness. He testified that he himself was working in the forward bunker hatch, bossing the men who were shoveling the coal which was lowered through the cross-bunker hatch, and that he knew one of the side hatches was off because some light came through. He testified that the conversation of which Schiano spoke, with reference to interpreting to the seaman about taking the hatch cover off, occurred in the daytime early, when he (Frank) was on deck. His testimony is as follows:

"Q. Tell what took place at that time? A. The crew of the steamship shifted the boat, the lifeboat, the big lifeboat, and after a while this other fellow came along, and he thought there was not enough support for the lifeboat on the deck, and he said that much.

"By the Court: Q. What did he say? A. He said that the boat was liable to fall over, and that is all I knew about it.

"Q. What orders did he give? A. He wasn't in a position to give orders; he was a sailor: he went to take this hatch cover, and took it up there.

"By Mr. Kirlin: Q. Did he take it? A. I concluded he took it off after I went down because I know more light came in through that part of the hatch.

"Q. You didn't see anybody take the hatch off yourself? A. No.

"Q. You didn't have any talk with anybody about taking it off? A. No."

Assuming that the testimony of these witnesses is correct—and their manner of testifying as well as the substance of their statement would seem to be worthy of belief—it would seem that the cover of the hatch in question was removed without any orders or participation on the part of the officers of the steamship, and solely at the instance of the

individual who was called by these witnesses "a sailor," whether his motive was that of protecting the fresh paint, or of steadying the pinnace which, to make room for the gangway, had been moved from its supports and was resting near the deck house alongside of the hatch in question.

It may be assumed that it was the duty of the vessel to furnish a safe place for the stevedores to perform their work, in so far as the equipment and parts of the steamer were concerned. It was also the duty of the steamer to avoid creating any danger or being guilty on the part of its officers or crew of any negligence which would create a trap or situation from which the stevedores might be injured, without being able to avoid the risk by due care on their part. It may also be assumed that negligence cannot be imputed to the vessel simply because certain hatch covers were or were not removed at the time the vessel was turned over to the stevedores for their work. The stevedores themselves had the right and were expected to remove such hatches as they might think necessary, or to put covers back in place as their work might require, and each one of the gang of stevedores was called upon to exercise reasonable care in using the different portions of the vessel where his work might take him. The stevedores also were workmen who assumed the obvious risks of their work, and who must be held to have considerable knowledge and experience in the use of the hatches and equipment of such a steamer. Especially would this be true of the foreman of the stevedoring gang, who himself was in charge and had the right to control the work of the stevedores and the places and means of doing their work. If the hatchway had been opened by one of the stevedores, the ship would not be liable. If the hatchway had been opened by a sailor, in broad daylight, and the stevedores with their foreman had proceeded to work around the open hatchway, they could not have held the ship responsible for any lack of reasonable care on their part when so doing.

Hence we come down to a consideration of the only point of view from which any liability might be placed upon the ship. If some sailor or some officer of the vessel, in the absence of the person injured, opened a part of the vessel, where reasonable care by themselves as to apparent risks would not be sufficient to protect the stevedores, and no care was taken to give warning or to call the danger to the attention of any one who could take proper precautions with respect thereto, then the ship would be liable, if contributory negligence were not present. In the case at bar, the most difficult question to determine is whether Fortuna was guilty of contributory negligence or lack of care upon his own part, in jumping over or from the gangway into a dark portion of the deck, where he was bound to know that hatchway openings would be unprotected if the covers had been removed, even though these hatchway covers were within the control of himself and his own men. Had he a right to rely upon the fact that he himself had given no orders, or that the work of which he was in charge had not progressed to the point where the use of these particular hatches might be necessary or convenient?

If he were bound only to use reasonable care with respect to the

dangers which he himself had created, then some liability might be predicated upon the act of a sailor in creating a condition of danger.

But it is considered that this is too extreme a doctrine under such circumstances. This court is unwilling to hold that the libelant exercised reasonable care in attempting to jump into and to traverse a dark space such as this was, with hatchways immediately in his path, when he was in charge of the lights, and was not compelled to proceed without investigation or without procuring sufficient light. His sole reliance was based upon the fact that the ship had been turned over to him, and that he had not ordered the hatches in question removed, and he did not use proper care for his own safety.

The libel will be dismissed.