## THE KONGOSAN MARU.*

(Circuit Court of Appeals, Ninth Circuit.   October 19, 1923.)

No. 3979.

1. **Shipping ⬤84(5)—Ship held not liable for injuries to employee of stevedore.**
   Where ship was turned over to stevedore company, neither ship nor her owner was liable for injuries to an employee of stevedoring company, where ship was properly constructed and equipped, though ship's officers knew that hatch into which stevedoring company was loading coal was left uncovered, libelant having had full opportunity to see that cover of hatch was off.

2. **Master and servant ⬤120—Stevedoring company held not liable to employee falling into open hatch.**
   Stevedoring company *held* not liable for injuries to its employee, who fell into open hatch after it became necessary to discontinue loading coal for the night; it not being negligent to leave coal hatch open at such time.

   Gilbert, Circuit Judge, dissenting.

Appeal and Cross-Appeal from the District Court of the United States for the District of Oregon; Charles E. Wolverton, Judge.

Suit in admiralty by George Young and Cora Young, his wife, against the Steamship Kongosan Maru, Mitsui & Co., and the Griffiths & Sprague Stevedoring Company. Decree (282 Fed. 666) for one-half damages against the stevedoring company alone, and the Stevedoring Company appeals, with libelants cross-appealing. Reversed.

These cross-appeals are from a decree entered in the court below on a libel brought by George Young to recover damages for personal injuries sustained by him by reason of the alleged negligence of the steamship Kongosan Maru and the Griffiths & Sprague Stevedoring Company, at the city of Seattle, Wash., where the ship arrived October 15, 1920. Upon her arrival, the ship was turned over by her owners and claimants to the stevedoring company for discharging her cargo and for the reloading and coaling of the ship. Young was at the time, and long had been, in the employ of the stevedoring company. That company completed discharging the cargo the next afternoon—October 16th—and at once arranged for coaling. The three coal hatches were on the starboard side of the ship, and about 18 or 20 inches from its rail, and between the coaming of those hatches and the deckhouse was a clear passageway 7 feet 2 inches wide. As the coal was to be taken aboard on the port side, it had to be carried across the ship in chutes, and prior to the erection of the necessary staging for that purpose the covers were removed from the three coal hatches. When those covers were so removed, they were placed upright against the rail of the ship on the port side and there fastened. There were five main hatches in the middle of the ship for loading and unloading cargo. After the stevedoring company had, finished the work of discharging the cargo, it proceeded to fumigate the ship, for that purpose necessarily placing the covers on the main hatches. When the work of fumigating was completed—between 11 and 11:30 in the evening of October 16th—the stevedoring company sent Young and another member of the cargo gang, named Maher, to uncover the main hatches, and when they had done so Young told his companion that he would go home, and, instead of proceeding along the 7-foot passageway by the deckhouse, that has been mentioned, started across the part of the ship where the coal hatches were located, and stepped into the open hatch 3, sustaining the injuries of which he complains.

As amended, the libel alleged that the coal hatch into which he walked was about 10 feet by 3 in size, and alleged that both the owners of the

---

ship and their representatives, as well as the libelant's employer, the stevedoring company, were guilty of want of due and ordinary care in leaving coal hatchway 3 "uncovered and unguarded, and without any light at or near said hatchway, or any device of any sort to warn any person approaching said hatchway of the danger incident to said opening; that said hatchway was left in said condition during the nighttime, while the deck of said ship in the vicinity of said hatchway was shrouded in utter darkness, so that it was impossible for any person approaching said hatchway to see the said hatchway was open and unguarded"; that the said hatchway is situated alongside of the rail of the ship immediately adjacent to a ladder, which was maintained by the defendants to the libel at the time in question for the purpose of permitting longshoremen working on the ship and other persons having duties thereon to go from the ship to the wharf or dock adjoining; that the hatchway was immediately in the path or course which any person proceeding from the ship to the ladder and to the dock was obliged to follow in the ordinary course of duty upon the ship; that it was necessary and proper for the libelant Young to walk along the rail upon the deck of the ship in order to reach the ladder extending from the ship to the dock, and that there was no other way provided for that purpose; that the condition of the hatchway at the time of the accident was unknown to the libelant, and that he was wholly unable to discover that it was open; that its cover was removed by officers and members of the crew of the ship; that the libelant was employed by the stevedoring company, who were at the time agents and representatives of the ship, its owners and agents; that the libelant, as an employee of the stevedoring company, was obliged to take his orders from the foreman in charge of the work, and undertook the work in question under the directions of such foreman; and that there was negligence on the part both of the stevedoring company and of the ship in permitting the hatchway to remain open, and in failing to warn the libelant of the danger incident to such opening, and without placing any light or guard to prevent him from falling therein, and in failing to make the deck of the ship a safe place for him to work.

The trial court exonerated the ship and its owners from any liability, but, finding negligence on the part of the stevedoring company and contributory negligence on the part of the libelant, awarded the libelant damages for one-half of the amount found to be sustained by him, and as respects costs and expenses further decreed that the libelant "bear his own expenses and costs of the suit and the stevedoring company its own cost, together with those of the ship." A decree to that effect was entered.

E. L. McDougal, of Portland, Or., and Rednan & Alexander, of San Francisco, Cal., for appellant.

Eugene A. Childe, of Seattle, Wash., and Thomas G. Greene and Allen H. McCurtain, both of Portland, Or., for cross-appellants.

Daniel B. Trefethen and Howard M. Findley, both of Seattle, Wash., for appellees.

Before GILBERT, ROSS, and RUDKIN, Circuit Judges.

ROSS, Circuit Judge (after stating the facts as above). [1] Damages growing out of personal injuries received by falling into the open hatchway of ships have always been of frequent occurrence, giving rise, in consequence, to a vast number of libels for recovery therefor. A very large number of such cases have been cited on behalf of the respective parties to the present cause and have received our careful consideration. To undertake to review and distinguish them would require an opinion of great length, which we think not only unnecessary, but that it would be contrary to the example lately set by the Supreme Court, as well as to the request indicated in the proceedings

of late annual meetings of the American Bar Association. In so far as concerns the ship, it is enough, we think, to point out that the libelant was not its employee in any respect, and that the sole negligence charged against it was the alleged absence of proper lights on the ship and knowledge on the part of its officers that the hatch in question was left uncovered.

We find nothing in the evidence calling in question the proper construction and equipment of the ship at the time that the stevedoring company, of which the libelant was admittedly the employee, was engaged to discharge her cargo and fumigate and reload her, and at the time that company entered upon that service. We understand it to be the well-established admiralty law that, unless some contractual relation existed between the vessel and the person injured, or that there was some failure on its part to perform some maritime duty or obligation, resulting in the injury complained of, neither the vessel nor its owners are in any wise liable for injuries sustained by an employee of a stevedoring or other independent contracting company in the work of coaling or discharging such vessel; and that the libelant so understood the law is indicated by the allegation contained in his libel that, as an employee of the stevedoring company, he was obliged to take his orders from the foreman in charge of the work, and undertook the work in question under the directions of such foreman.

Turning to the record, we find the testimony, both of the superintendent of the stevedoring company and of the boss of its coaling gang, to the effect that the coaling of the ship was entirely in the hands of the stevedoring company. The witness John Allbin, who was the boss of the coaling gang on the occasion in question, testified that he had been working for this stevedoring company at Seattle for 15 years, that the coal was expected to be brought in a barge alongside the ship about 4 o'clock Saturday afternoon of October 16, 1920, and described the rigging by which the coal was to be taken from the barge (in this instance on the port side of the ship), by means of a crane and clam shell and dumped into a chute which passed over the deck of the ship, supported by a horse, and thus dumped into the coal hatches; that, due to delay by reason of a storm, the coal did not actually reach the ship until the next afternoon, Sunday, at 6:30, at which hour the coaling of the ship was begun, but that he and his coaling gang took the covers from the coal hatches Saturday night and lashed them to the side of the boat, so that everything would be ready when the coal arrived. It did arrive, as has been said, Sunday at 6:30 p. m., when the coaling was commenced; but, finding that the wet condition of the coal required a higher pitch of the chute, and being unable, on account of the lateness of the hour, to get additional men in order to raise the chute, the work was obliged to be discontinued for the night—it having been expected, when commencing, to complete the coaling by midnight of Sunday.

[2] It is true that the record shows that the captain and at least one other officer of the ship knew, when the captain went ashore at 6 o'clock Sunday evening, that the coal hatches were uncovered; but what of it? The coaling had then been commenced, and was in the

actual charge of the coaling crew of the stevedoring company. They had taken the covers off the coal hatches, as was necessary, and had stood and fastened them against the rail of the ship. They cast, it appears, a shadow over coal hatch 3, but otherwise, it clearly appears from the evidence, the ship was well lighted. We agree with the court below that the libelant had full opportunity to see that the covers of the coal hatches were off, as he was on that part of the ship in question during both the afternoon and evening of Sunday in pursuance of his work for the stevedoring company, and himself went ashore about 4 o'clock in the afternoon of Sunday by means of the ladder extending from the ship to the dock, and returned in the same way in the evening, when he and Maher went aboard to remove the covers from the main hatches, and must have known that the coal hatches were open and their covers fastened to the rail, only 18 or 20 inches from the hatches, and he must have known and seen that along the deckhouse was an open passageway, about 7 feet 2 inches wide, by which he could go to the ladder from the ship to the dock. It is not pretended that there was any shadow across that passageway, or anything to impede the libelant's passage along it. Nevertheless he chose to take a short cut across the deck of the ship, and most unfortunately walked into the open hole, with the distressing results that have been stated.

We are unable to hold that the ship or its officers were in any respect culpable. The court below, however, held that, when it was ascertained Sunday evening that it was necessary to suspend the coaling operations until the next day, the duty thereupon devolved upon the stevedoring company to put the covers on those hatches, and, applying the safe place doctrine to the situation, held that company liable for such neglect. It is obvious that, being a corporation, the company could only replace the covers through its employees, each of whom was a fellow servant of the others engaged in the general undertaking of discharging, coaling, and reloading the ship. That such stevedores are now as clearly identified with maritime affairs as the mariners themselves, and, consequently, governed by the maritime law, was distinctly adjudged by the Supreme Court in the carefully considered case of Atlantic Transport Co. v. Imbrovek, 234 U. S. 52, 34 Sup. Ct. 733, 58 L. Ed. 1208, 51 L. R. A. (N. S.) 1157. We need not, however, decide whether the safe place doctrine or the fellow servant rule should apply to the present case, for the reason that we are of the opinion that there was no negligence committed in leaving the covers off the coal hatches at the time in question.

It is undisputed that the coaling of the ship was commenced by the stevedoring company at 6:30 in the afternoon of Sunday, and that, finding that the wet condition of the coal required a higher pitch of the chute through which it was being passed, and being unable, on account of the lateness of the hour, to get additional men in order to raise the chute, it became necessary to discontinue the work for the night, during which interval the libelant carelessly, as the court below rightly found from the evidence, walked into open hatch No. 3. The rule properly applicable to the case is, we think, well stated in the case of Dwyer v. National Steamship Co. (C. C.) 4 Fed. 493, which ruling

has been many times approved in subsequent federal cases. In that case Judge Benedict said:

"Hatchways are well-known features and sources of danger on a ship. They are intended to be open a large portion of the time, especially when in port, not only for the purposes of loading and unloading cargo, but also for ventilation. An open hatchway on a ship, when provided with the usual coamings, is not evidence of a neglect of duty on the part of the shipowner. On the contrary, a shipowner has the right to allow the hatchways of his ship to remain uncovered and unprotected, except by the usual coamings; and all persons moving upon the decks of a ship are chargeable with notice of the probable presence of open hatchways on the deck. Neither is it the duty of the shipowner to maintain a guard stationed at the hatchway of his ship for the purpose of protecting persons from injury by falling into it. Such a duty would be burdensome in the extreme, and is not required by the law. * * * The requirement would be unreasonable, has never been observed in practice, nor, so far as I know, declared in any adjudicated case."

Among the numerous cases approving that rule is that of Horne v. George H. Hammond Co., 71 Fed. 314, 18 C. C. A. 54, where Judge Putnam, delivering the opinion of the Circuit Court of Appeals of the First Circuit, stated the facts thus:

"The plaintiff's intestate for whose injuries this suit was brought, was a stevedore having general charge of loading the ocean steamer Virginian, at Boston, with a general cargo, and working several gangs day and night. The injury occurred about half past 10 o'clock in the evening of January 24, 1887. The ship had three decks—the main or spar deck, next below it the steerage deck, and below that the orlop. At the time of the injury, and during the whole evening, one of his gangs was, and had been, working on the steerage deck receiving cargo through the hatchway in the spar deck upon the hatch in the steerage deck, which was being used as a landing place. Their work, however, was on the forward port section of the hatch, from which point they were running the cargo forward. Expecting at any time cargo for the hold, they had left the hatchway in the orlop deck open. The defendant corporation had control of a space on the orlop deck for shipping meats, and the right to visit it for refrigerating purposes. The hatchway on the steerage deck was about 20 feet long and 10 feet wide, divided longitudinally by the strong-back, from which there extended each way to the hatch coamings sections of hatch coverings about 5 feet long and 2½ feet wide. While the stevedores were at supper, the defendant's employees took off the after-starboard section or leaf of this hatch, and went below for icing the meats. About half past 7, while these employees were still below, the stevedores returned, and resumed work between the spar and steerage decks on the forward port side of the hatch. As to what lights they had there is no evidence in the case, except that one of the plaintiff's witnesses testified that 'the deck of the steamer was lighted by lamps, candles.' About half past 8 the defendant's employees, having finished their work, extinguished whatever light they had, and came up through the leaf or section of the hatch which they had removed, without replacing it, and without warning the deceased. The employee who last came up was called as a witness by plaintiff. He did not state why he did not replace the leaf, and was not even asked the reason; but whether there was enough in the case to enable a jury to find that the omission to replace it was without occasion we need not determine. The deceased was between-decks at the hatch during the evening, hurrying up his men; but whether or not he knew the leaf was off remains a matter of conjecture. About half past 10, as told by the only witness who claims to have seen him, he came down the ladder, which was close to the port edge of the strong-back, 'and turned right off with his foot on the starboard, and went right down in the hold.' We have stated all the essential facts favorable to the plaintiff which the evidence proved or tended to prove and also those favorable to the defendant which were not denied, or must be accepted as

undeniable. The case went to a jury, which, under the direction of the court, returned a verdict for the defendant."

The court, in affirming the judgment of the Circuit Court, said, among other things:

"Coming, now, to the only question before us, the issue is not so broad as to touch upon the duties and responsibilities connected with a ship's hatchways at all times or towards all persons, but only while the ship is under employment, or is in some state with relation thereto, and towards stevedores, mariners, and perhaps others commonly found aboard in connection with her service. These duties and responsibilities undoubtedly involve mixed questions of law and fact; but with reference to the ordinary class of cases of which this is clearly one, the questions both of law and fact have come so often before the courts that they have settled into a well-known practical rule, which the courts will not allow juries to disregard. While, therefore, the issue is not wholly one of law, yet if this case had been submitted to the jury without a peremptory instruction, and the jury had found against the rule, the court would properly have set aside the verdict; and it is now thoroughly settled in the federal courts that under such circumstances the court should instruct the jury peremptorily."

In The Gladiolus (D. C.) 21 Fed. 417, where a stevedore engaged in his usual occupation fell through an ordinary coal bunker hatch used for storing cargo, the presumption was that his fall was due to his own negligence. The court said:

"The leaving open a common between-deck hatchway while the vessel is lying in port, under ordinary circumstances, is not presumptive evidence of negligence on the part of the ship. This is not only shown to be the custom by the testimony in this case, but it has been so frequently commented upon in decisions as to be too well settled to be questioned. The Victoria, 13 Fed. 43; Dwyer v. Nat. Steamship Co., 4 Fed. 493; The Carl, 18 Fed. 655; The Germania, 9 Ben. 356; The Helios, 12 Fed. 732. While the falling through an open hatchway by a stranger, a landsman, visitor, or passenger on board a vessel might not be presumptive of negligence on his part, where such accident occurs to a seaman or stevedore, who is accustomed to hatches, their presence, necessity, uses, character, and location, the case is different. and unless the circumstances of the particular case are such as to rebut it, the first presumption is of his negligence."

In The Jersey City (D. C.) 46 Fed. 134, the libelant was a stevedore employed by charterers of a part of the ship to help put up a refrigerator in the hold. On leaving his work about midnight, he fell down the hatchway, and libeled the vessel for injuries thereby received, claiming fault in that the hatch was not covered and lights maintained about the opening. The court said:

"The evidence shows that it is not customary on shipboard to cover the hatches between decks while the vessel is in port until her cargo is loaded. The way to the between-decks was by a ladder that ran from the forward side of the upper hatchway perpendicularly down to the coamings of the forward side of the hatch below. The ladder was in the middle of that side, and about five feet from each corner. Stevedores were at work upon the cargo during the day, and had been going up and down by the same ladder into the hold below, so that that part of the hatch which was at the foot of the ladder was kept uncovered, in accordance with the usual practice. The only proper way of going to the ladder was from the deck immediately in front of the hatch. The libelant testifies that at midnight, on quitting work, he went to the side of the hatch near where he had been working, raised his foot to step upon covers which he supposed to be there, and at the same time reached forward for the ladder, but fell down the hatch,

because no cover was there to step on. He says also that it was dark because the lights were extinguished, as had been ordered. From other testimony, however, including some of the libelant's own witnesses, it is quite certain that there had been no covers at the foot of the ladder at any time during the day. The libelant when he came down at noon, when he went up at 6 o'clock for supper, and when he came down to work again at 7 p. m., must have seen and known that there were no covers there. To repeated inquiries of the court, he would not say that at either of these three times he had stepped upon any covers in going down or going up the ladder; and it is plain that he had not. One of his own witnesses also testified that, instead of stepping in from the side of the hatch, he stepped upon the corner, and, as the ladder was five feet from the corner of the hatch, it is incredible that he should have stepped up from the side of the hatch where he was working, and at the same time reached out his hands for the ladder. Each of the workmen during the evening had been supplied with one or two candles. When the libelant fell, only a part of the candles had been extinguished, and one was burning within six feet of the hatch. From these facts it is evident that the libelant's fall was owing to his own negligence alone. He knew perfectly the proper means of access to the ladder, and that there were no covers at the foot, and that he could properly approach the ladder in only one way, viz. the way he had gone three times. At midnight he was among the first to start to go up. It is likely that in his haste he stepped upon the corner and rashly intended to walk upon the coamings to the ladder, instead of keeping on deck. Whether this be so or not, there was no fault in the ship towards him."

In The Saratoga, 94 Fed. 221, 36 C. C. A. 208, the libelant was one of a gang of men engaged in coaling the steamer while she lay at the pier, and sued for personal injuries sustained by him in falling through one of the open hatches. In holding that he was not entitled to recover, the Circuit Court of Appeals said, among other things:

"The District Judge held that the hatch coverings were customarily left off when the vessel was in port. The evidence in support of that proposition is, as he expresses it, 'full, uncontradicted, and satisfactory.' Indeed, it should take but little proof at this late day to satisfy a court of admiralty, sitting in this port, that, when a vessel is lying here between trips, one cargo discharged and the next not yet stowed, it is usual to have her between-deck hatches off, day and night, to sweeten the hold. With the knowledge of this condition of things the libelant must be held charged. Passengers, visitors, or workmen from shore unaccustomed to the regulation of the ship's internal economy who are invited by the owner, either expressly or by implication, to wander about in the vicinity of such hatches, may hold the owner responsible for results; but so far as the crew, and the regular gangs of workmen from shore, who are familiar with the location and regulation of the hatches, are concerned, their knowledge of the situation and their continuance at work are held to be conclusive evidence that, as to the particular danger of which they were thus advised, they took their risk. This has been held so many times that it is unnecessary to cite authorities."

The Louisiana, 74 Fed. 748, 21 C. C. A. 60, was a libel by a stevedore (Harty) for damages sustained by him in falling down an unguarded hatchway. The Circuit Court of Appeals of the Fifth Circuit, after detailing the facts, in holding that the accident was due to his own negligence, said, among other things:

"Mr. Harty's case is very similar to that of the libelant in Re Sir Garnet Wolseley, 41 Fed. 896, where a night watchman undertook to sit down upon a hatch on the main deck, assuming the hatch cover to be on, and without looking to see whether the cover was on or not, and fell backward into the hold. In this case so experienced an admiralty jurist as Judge Benedict held

that there was no right to recover, and the libel was dismissed. In the case of The Jersey City, 46 Fed. 134, decided by Judge Brown in the District Court for the Southern District of New York, the libelant like Harty was a stevedore. On leaving his work he fell down the hatchway, and claimed that the hatch was not covered, and that lights were not maintained about the opening. The evidence showed that it was not customary to cover the hatchway until the cargo was in, and the open hatchway was known to libelant. The libel was dismissed upon the ground that the libelant's fall was due to his own negligence. In this case the libelant fell at midnight. Mr. Harty fell in the daytime. It is, moreover, apparent that the duty of covering and uncovering the hatchway whenever that was necessary, rested upon the squad of laborers who happened to be working between-decks, and they were fellow servants of Harty. Murphy v. Rubber Co. (Mass.) 34 N. E. 268. Therefore, in any event, he could not recover. If it be, as insisted, that this squad was under the control of the foreman Marigny, still the rule would be applicable, for Marigny was an underforeman—a third foreman, as he is called—and is to be treated as the fellow servant of the laborer."

The decree is reversed, with costs to the appellant and against the cross-appellants.

GILBERT, Circuit Judge (dissenting). The opinion of the majority of the court is based upon authorities which I submit have no relation to the facts in the case. Thus, in The Gladiolus (D. C.) 21 Fed. 417, it is held that, where a stevedore, engaged in his usual occupation, falls through an open hatch that is being used for stowing cargo, the presumption is of his negligence rather than that of the officers of the vessel. Dwyer v. National Steamboat Co. (C. C.) 4 Fed. 493, and Horne v. G. H. Hammond Co., 71 Fed. 314, 18 C. C. A. 54, are authority for the proposition that an open hatchway on a ship when provided with the usual coamings is not evidence of negligence on the part of the shipowner. In The Victoria (C. C.) 13 Fed. 43, recovery was denied on the ground that the accident occurred from the act of a fellow servant who had removed the light which made the hatchway visible. In The Carl (D. C.) 18 Fed. 655, it was held that the hatches were, "as is usual with vessels unloading," rightly left open and unguarded, and that the immediate and proximate cause of the injury was clearly the forgetfulness and inattention of the libelant. In The Jersey City (D. C.) 46 Fed. 134, the stevedore fell down a cargo hatchway, and the evidence was it was not customary to cover the hatch until the cargo was in. In that case there was no lack of sufficient light. All of these cases pertain to cargo hatchways, provided with coamings and left open during the process of unloading or stowing cargo in the vessel.

The Helios (D. C.) 12 Fed. 732, mentioned in the majority opinion, must have been cited by inadvertence. The doctrine there announced would lead to the affirmance of the decree which is here appealed from. That was a case where the libelant fell through a hatch in the between-decks. The court said:

"It was not a hatch for the usual stowage of cargo, such as stevedores must at their peril look out for and are presumed to know about. It had no reference to the cargo, and the stevedores had no business with it, as the evidence shows. When the first mate told the stevedore the vessel was ready for him to proceed to stow the cargo, that was a virtual warranty against all such traps in the darker parts of the vessel, which could not be or would not be perceived in the ordinary course of stowage."

That case recognizes the distinction which is ignored in the majority opinion herein, the distinction in the law of negligence between cargo hatches and coaling hatches. The former are, as the decisions point out, large openings protected by coamings from 12 to 20 inches in height above the deck. The latter are small openings unprotected by a rail or coaming, and open only during the operation of coaling. It was into such a hatch that the appellee, Young, fell. In The Guillermo (D. C.) 26 Fed. 921, Judge Brown, who had decided The Helios Case, held in a case where libelant, who was acting as roundsman to see that the night inspectors were at their post, fell across an open coaling hatch which was in a comparatively narrow passageway, where it was perfectly dark, that leaving such a hatchway open was negligence. In that case the hatch was protected by coamings 18 inches high. Over these the libelant stumbled and fell. Said the court:

"The open hatch was not in the situation of the ordinary open hatches for a discharge of cargo, such as may be expected to remain open in port, and which persons going upon the ship must avoid at their peril. This hatch was in a comparatively narrow passageway along the side of the ship."

So in The Protos (C. C.) 48 Fed. 919, it was held that to leave a small trimming hole in the lower deck of a vessel, a short distance from the main hatch, open and unguarded, when the vessel was unloading, where it was to be expected that stevedores would necessarily go, and where it was dark and unlighted, was negligence, for which recovery could be had, and that there was no contributory negligence. The hole in that case was about 3½ feet long by 2 feet wide, and was 20 feet away from the main hatchway, in a dark place, and it was flush with the deck. Among other cases in point are The Illinois (D. C.) 63 Fed. 161, and Burrell v. Fleming, 109 Fed. 489, 47 C. C. A. 598.

The stevedores were divided into two gangs, and were engaged in rendering two distinct services. The one, called the "cargo gang," had been removing the cargo from the hold. The other, called the "coal gang," had been engaged in stowing coal into the coal bunkers. Each gang had its separate foreman, and both were under the direction of the general superintendent of the stevedoring company. The appellee, Young, was a member of the cargo gang. He had nothing to do with the coaling operations. At 6 o'clock of the day before the accident the head foreman or general superintendent had directed the foreman of the coal gang to be careful and cover the coaling hatches and to get a light at the gang plank. The stevedores knew that the operation of coaling at the Seattle dock had been completed, and that nothing remained to be done by them, except to remove the covers from the cargo hatches, at 11 o'clock that night. There was no occasion for leaving the coal hatches open. There was every reason why they should be closed. The appellee, Young, testified that, the last time he noticed the coal bunker hatches, the covers were on. He had nothing to do with the coal hatch into which he fell, and he had no occasion to examine it. Said the court in The Illinois (D. C.) 63 Fed. 161:

"Wherever the workmen have occasion to go, or customarily go, in the course of their employment, the vessel must be safe. * * * Every part of the deck to which it might be anticipated the men would go should have been made safe."

There was failure of proof of a custom to leave covers off the coal bunker hatches while in port. The foreman of the coal gang testified that covers are put on when the coaling is finished. On the other hand, cargo hatches, which are large openings to discharge and receive cargo, usually remain open while the vessel is in port, or, at least, until her cargo is aboard. Stevedores are presumed to know that such hatches are open. Coal bunker hatches are in comparison small openings. They are never open for the purpose of airing the hold, and stevedores have the right to assume that they are closed, except while they are open for coaling.

To my mind, if any doubt is entertainable as to the correctness of the conclusion of the court below, a conclusion which was reached after very careful consideration, it is doubt whether the damages should have been cut in twain by reason of contributory negligence.