## SEAS SHIPPING CO. v. WARD.

### THE SANTA CECELIA.

Circuit Court of Appeals, Ninth Circuit. October 24, 1927.

No. 5241.

Shipping ☞84(3½)—Ship held not liable for injury to longshoreman by stepping into hatchway from which he was assisting in removing the cover.

Injury to a longshoreman by stepping into a hatchway in the daytime while assisting another workman in removing a loosely placed cover *held* not due to fault of the ship, but to his own inattentions; the place being reasonably safe for the purpose of the employment in which he was engaged.

Appeal from the District Court of the United States for the District of Oregon; John H. McNary, Judge.

Suit in admiralty by G. H. Ward against the steamship Santa Cecelia; The Seas Shipping Company, claimant. Decree for libelant, and claimant appeals. Reversed, with directions.

Erskine Wood, Gunther F. Krause, and Wood, Montague & Matthiessen, all of Portland, Or., for appellant.

W. M. Davis and Paul R. Harris, both of Portland, Or., for appellee.

Before HUNT, RUDKIN, and DIETRICH, Circuit Judges.

RUDKIN, Circuit Judge. This was a libel to recover damages for personal injuries suffered by a longshoreman while engaged in removing the covering from a hatch on the Santa Cecelia at Portland, Or. From a decree in favor of the libelant, claimant has appealed.

There is little conflict in the testimony and little controversy over the controlling facts. The vessel had discharged part of her cargo at Longview, Wash., and was about to proceed to Portland to discharge the remainder. Some small boxes containing freight were piled up alongside of No. 4 hatch on the shelter deck, and, fearing that the vibration of the ship on the trip to Portland would cause them to topple over through the hatch onto the deck below, the mate directed the longshoremen to cover the hatch. They proceeded to do so, and discovered that one of the hatch covers used for that purpose was too short. This fact was called to the attention of the mate and he directed the longshoremen to throw the hatch covers athwartship. This they did. Two hatch covers were placed lengthwise across the end of

the hatch, resting on the hatch coaming, and the short hatch cover was then placed in position over the hatch; one end resting on the two hatch covers thrown athwartship and the other end resting on the king beam. The whole hatch seems to have been divided into three sections, but only about one-half of the two sections adjoining the freight boxes was actually covered.

On the morning after the ship arrived in Portland, the appellee and three other longshoremen were directed to remove the covering from hatch No. 4 and proceeded to do so. The appellee and a fellow workman lifted the short hatch cover from its place, intending to remove it to the wing, and as they did so the appellee stepped forward into the hole from which the hatch cover had just been taken, receiving the injuries complained of. A clear statement of the manner in which the accident occurred was given by the fellow workman who was assisting the appellee at the time of the injury and was a witness in his behalf at the trial. The statement was made on the day of the injury and was admitted by the witness to be correct, except in one particular which we will omit. The statement as admitted to be correct was as follows:

" * * * We found the shelter deck about half covered. The covers which were in place were pretty well scattered throughout the hatch, although the starboard side was pretty well covered, with the exception of the corner hatch at the starboard forward corner. I could see that two hatch covers had been laid crosswise over this opening, right close together at the forward end of the opening, and another hatch cover was laid on top the two crosswise covers fore and aft. This hid the opening from my view. I knew that those hatch covers were laid that way to cover a hole, although I didn't actually see the hole until I helped pick the lengthwise hatch cover up. * * * I took hold of the aft end of the cover laying on top the two crosswise covers, and Ward took hold of the forward end. Nothing was said between us about a hole or opening being underneath the cover. Ward picked his end up facing aft. I faced forward. We carried the cover about even with our stomachs. I started to walk backwards to put the cover in the wing. As I picked the cover up at my end, I could see there was an opening there; but I didn't know whether Ward knew there was a hole there or not. I supposed he knew, but nothing was said about it. I expected him to step to one side in passing it; but instead he

walked straight ahead and stepped right into the hole. He went only two steps or so before he stepped in. When I saw him step in, I yelled; but it was too late. * * * It was daylight where we were working on the shelter deck at the time of the accident."

The other testimony in the case in no wise conflicts with this description of the place and the accident. The appellee himself testified that he naturally supposed there was another hatch cover underneath; that in fact he never looked at the hatch cover until he went to pick it up, and that he did not particularly notice how they were piled or placed.

The safe place doctrine can have but a limited application to a case like this. A place may be safe for one purpose, or at one time, and unsafe for another purpose, or at another time. The hatch covering in question might have been an unsafe place as a platform for workmen, or it might have been unsafe to pass over in the darkness; but was it unsafe, considering the fact that the sole duty of the appellee and his fellow workmen was to remove the covering from the hatch? In our opinion it was not. The workman who assisted the appellee apparently saw at a glance that the hatch cover was over an opening, and assumed that the appellee had observed the same thing. He was so confident of this that he gave neither notice nor warning. Of course, his knowledge and his conduct are not controlling here; but they show quite plainly and conclusively that the danger was open and apparent to ordinary observation. And, had the master of the ship been fully advised as to the manner in which the hatch had been covered, would it have occurred to him, or to any reasonably prudent person in the like circumstances, that it would be necessary to inform competent stevedores of the true situation before directing them to remove the hatch cover, or to inform them that they might fall through the opening in the hatch after removing the covering therefrom? We think not.

For these reasons, we can see no escape from the conclusion that the working place was reasonably safe, considering the nature and purpose of the employment in which the appellee was at the time engaged, and that the accident was attributable solely and only to inattention on his part, and to his failure to exercise reasonable and ordinary care for his own protection and safety.

The decree is therefore reversed, with directions to dismiss the libel.