960

OVE TYSKO v. ROYAL MAIL STEAM
PACKET CO.
No. 7547.

Circuit Court of Appeals, Ninth Circuit.
Feb. 10, 1936.

Wm. P. Lord and T. Walter Gillard, both of Portland, Or., for appellant.

E. L. McDougal, of Portland, Or., for appellee.

Before DENMAN, MATHEWS, and HANEY, Circuit Judges.

HANEY, Circuit Judge.

In an action for personal injuries sustained by appellant as the result of a fall through an open hatch of a vessel owned by appellee, the trial court directed a verdict for appellee and entered judgment accordingly. Appellant was a longshoreman in the employ of a stevedoring company, a corporation which had entered into a contract with appellee for the loading of cargo on the vessel.

Appellant was working in the lower 'tween-decks when the accident happened. The floor of this part of the hatchway was made up principally of sixteen separate hatch covers or plugs, which were four feet ten inches square, with the exception of three strong-backs a foot wide running between the four rows of plugs, and coamings around the edge of the floor which rested against the walls of the refrigerator compartment. The plugs and strong-backs above this floor were removed, and the hatch was open thereabove. The longshoremen stowing cargo on the floor referred to descended to the floor by means of a ladder a few inches from the wall in one corner. The plug immediately beneath the ladder had been removed and was covered with dunnage. In the afternoon of the day of the injury, appellant with other workmen descended the ladder, and, when they had reached the floor where they were to work, walked around the hole.

One of the stevedores testified on behalf of appellant that he "kicked" about the hole because he did not think it was safe, and called for the gear to put the plug in place, and that the mate of the ship said that the plug could not be put in the hole because sailors were working in the hold below. He also testified that the longshoremen "growled a little bit, and went to work." He further testified that he knew there was one sailor in the hold below, because he "noticed one coming up about supper time," but did not know whether or not there were any sailors in the hold after 6 o'clock. Another stevedore testified that the mate of the ship prevented the men from closing the hatch "because men working down below." This witness, however, had no knowledge as to whether or not there were any men in the hold below after 6 o'clock.

Appellant had knowledge of the opening because he walked around it when he descended to the floor in question in the afternoon; he walked around it when he ascended the ladder at 5 o'clock; and he walked around it when he descended the ladder about 6 o'clock the same day.

The evidence as to whether or not it was customary to leave such an opening was conflicting. Witness Dyblie, a longshoreman, testified on behalf of appellant:

"Q. Is it customary to work with an open hole in the hatch that way? A. No."

And on cross-examination testified:

"Q. * * * You say you are a longshoreman and have been around ships. Now isn't it as a matter of fact customary when boats are lying in port, to have these hatchboards off the different hatches when men are working around there, to have them off also for the purposes of ventilation? A. I don't know anything about the ventilation part.

"Q. You don't know anything about that? A. No.

"Q. How about when men are working down there, such as these sailors down in the hold? A. They have to have the hole open to get out.

"Q. Certainly. And how about air? Those refrigeration sections are airtight in there, aren't they? A. Well practically, I suppose.

"Q. Practically? A. Yes.

"Q. Isn't it proper for the ship to have some of these hatches off to ventilate these holds, when the ship is lying in port? A. That is not for me to decide."

Witness Harmening, a mate, testified on behalf of appellant and "* * * was * * * asked the question whether it was customary while longshoremen were working on tope (top?) of the hatchcovers or boards and cargo was being lowered into the hold and dragged across the top of the boards to leave any of the hatchcovers off, and he answered: 'It shouldn't be.'" Witness Carlson, a longshoreman, for appellant "was asked if they usually leave hatchcovers off when men are working there and he answered, 'No they are supposed to be closed.'"

Foreman Sweet testified for appellee that "there was nothing unusual in leaving this hatch uncovered and they all knew it, had to step over it to get down there, and he did ten or twelve times." On cross-examination:

"He was asked if working two hatches at the same time was considered a safe way to work a ship and he answered that it is done the world over, and when asked if safety experts considered it safe he answered that they do it every day on this river if occasion demands it. He further

testified: Q. Is it safe? A. It isn't safe if you are loading timber or such like that, but package goods similar to what I was loading there.

"When a section is left out of a hatch he never left a line for the longshoreman to grab on to in event they fall, but it could be done, but was not necessary. A man is not going to step off there. He can see it."

Witness Jorgensen, a longshoreman who replaced Foreman Sweet after 5 o'clock, called for appellee, testified on cross-examination:

"Q. You saw the plug out, didn't you? A. I did, sir.

"Q. Did you want to put it in? A. No. I didn't put it in.

"Q. Well did you think you ought to put it in? A. Well I don't know; I was told to leave it out, so I left it out.

"Q. That was the only reason you left it out, was because you were told to, is that it? A. Yes.

"Q. Is that right? A. Yes, sir.

"Q. Otherwise you would have put the plug in? A. Well I don't know. They had worked all day with it before I came there. * * *"

There was no evidence that a complaint of the absence of the plug was made directly to the foreman of the stevedores, but the foreman testified that "he had talked it over with the mate about the plug being out and leaving the hole" and "* * * I didn't see there was any necessity of putting in that plug. In the first place, we would have had to pull it out from under the dunnage. We all knew about it. We had walked about them for a good many years. Our men was working twelve feet from it. * * *"

He also testified that the mates and some of the sailors went up from and down to the hold below, and that they had "knocked off (work) at five" o'clock; that he had told the foreman who relieved him to leave the plug out to enable him to get dunnage from the deck below if he needed it; that "* * * coming up and going down the coast the hatches may be washed and cleaned out, and the hatchcovers are left off in order to air them out so that air can circulate in them and dry them out, and when the ship is at dock in good weather they like to air out their ships. They get moldy the same as a cellar or basement if they are not aired out. * * *"

962

There was no evidence that there were any men in the hold below after 6 o'clock or that this particular hatch had been washed or needed ventilation. There was evidence from which it could be inferred that the dunnage on the floor where appellant was working was sufficient to complete loading that part of the vessel, which was the refrigeration compartment.

When a load of cargo was lowered in the hatch, it was appellant's duty to steady the same while it was being lowered to the floor. After one of these loads had been removed from the slingboard, appellant was walking backwards with the slingboard, to make way for another load, and fell through the opening to the deck below, sustaining the injuries of which he complains. It also appeared from the evidence that the mate of the ship had authority to order that the plug be left out.

The trial court, in sustaining the motion for a directed verdict made by appellee, held that appellee was not negligent as a matter of law in leaving the plug out. Such ruling presents the only question for review urged before us.

In Grays Harbor Stevedore Co. v. Fountain (C.C.A.) 5 F.(2d) 385, 386, this court stated the duty which the owner of a vessel owes to stevedores, as follows: "The owner of a vessel owes to stevedores engaged upon the vessel the duty of exercising reasonable diligence to furnish a reasonably safe place in which to perform their services and a reasonably safe passageway to and from their work and appliances reasonably suited to the purpose for which they are used and such as are customary and usual for ships of that kind, and it is the duty of the shipowner to give such stevedores notice of any latent dangers or defects in the ship or the appliances." See, also, The Joseph B. Thomas (C.C.A.9) 86 F. 658, 660, 46 L.R.A. 58.

■ The general rule is that there is no duty on the shipowner to keep the usual hatchways covered while loading or unloading the vessel, and therefore such owner is not negligent in permitting the hatchways to remain open. The Kongosan Maru (C.C.A.9) 292 F. 801; Horne v. George H. Hammond Co., 71 F. 314, 18 C.C.A. 54, reversed on other grounds, 155 U.S. 393, 15 S.Ct. 167, 39 L.Ed. 197; and see Long v. Silver Line (C.C.A.2) 48 F.(2d) 15, 16; The Gladiolus (C.C.Ga.) 22 F. 454; Dwyer v. National Steamship Co. (C.C.N.Y.) 4 F. 493, 17 Blatchf. 472; Jones v. Gould

Steamship & Industrials (D.C.Md.) 300 F. 109; and in District Court of New York: The Jersey City, 46 F. 134; The Argonaut, 61 F. 517; The J. W. Taylor, 92 F. 192; The Auchenarden, 100 F. 895; and The Susquehanna, 176 F. 157.

■ Where there is a custom, however, to close such an opening, a duty to cover it arises, and a breach of that duty may constitute negligence on behalf of the shipowner. Pioneer S. S. Co. v. Jenkins (C.C.A.6) 189 F. 312, 316. In the instant case, the evidence is conflicting as to the custom with respect to covering such openings, and therefore we must view the evidence in the light most favorable to appellant, since the court sustained the motion made by appellee for a directed verdict. Assuming, then, that there was a custom of closing such openings under the circumstances of this case, in accordance with the rule stated above, this custom gave rise to a duty on behalf of appellee to close the openings. If appellee has breached this duty, then it was negligent.

Recovery has been allowed in some cases of a like kind where the injured person had no knowledge of an unusual opening. See The Helios (D.C.) 12 F. 732; The Protos (C.C.Pa.) 48 F. 919; Burrell v. Fleming, 109 F. 489, 47 C.C.A. 598; West India & P. S. S. Co. v. Weibel, 113 F. 169, 51 C.C.A. 116; Pioneer S. S. Co. v. Jenkins, supra. Compare the Guillermo (D.C.N.Y.) 26 F. 921, and The Illinois (D.C. Pa.) 63 F. 161.

■ In 45 C.J. 877, it is said: "The general rule is that, where proper notice or warning is given, defendant is relieved from liability for injuries received by those who do not heed it, unless disregard thereof is invited, or acquiesced in, by defendant. * * *" See, also, Seas Shipping Co. v. Ward (C.C.A.9) 22 F.(2d) 251, 252.

Because appellant had actual notice of the danger, appellee was not required to give notice or warning. 45 C.J. 876.

■ Since appellant had notice of the danger, appellee is relieved from liability.

Affirmed.

MATHEWS, Circuit Judge (concurring).

This action is based on a maritime tort. Hence, though brought in a common-law court, it is governed by the general rules of the maritime law. Carlisle Packing Co. v. Sandanger, 259 U.S. 255, 259, 42 S.Ct.

475, 66 L.Ed. 927. Under these rules, the owner of a ship which is being loaded by a stevedoring company, under contract, is not liable for injuries to an employee of the stevedoring company who, while assisting other employees in loading the ship, steps or falls into an open hatch, the location and condition of which he has observed and is fully aware of. The Kongosan Maru (C.C.A.9) 292 F. 801, 803; Seas Shipping Co. v. Ward (C.C.A.9) 22 F.(2d) 251, 252. The evidence shows, without conflict or dispute, that appellant's injuries were so received. There was therefore no error in directing a verdict for appellee.