READ v. UNITED STATES.

UNITED STATES MARITIME COMMIS-
SION v. WILLIAMS et al.

Appeal of VASSILOPOULUS et al.

Nos. 10668, 10671.

United States Court of Appeals
Third Circuit.

Argued Oct. 7, 1952.

Decided Feb. 4, 1953.

Before MARIS, KALODNER and HASTIE, Circuit Judges.

KALODNER, Circuit Judge.

Libellant brought an action in admiralty against the United States, owner of the vessel SS Langdon Cheves, for personal injuries sustained in the course of his employment on board the ship while he was an employee of a subcontractor. He alleged that the shipowner was negligent and that the vessel was unseaworthy.

The United States, under Admiralty Rule 56, 28 U.S.C., joined the Pioneer Engineering Company ("Pioneer") with whom it had a contract for repairs and alterations. The United States also joined as additional respondent South Philadelphia Boiler Cleaning Company ("South Philadelphia"), the subcontractor of the general contractor. South Philadelphia was the employer of the libellant here, George Read.

The facts, as found by the District Court, were substantially as follows:

Pioneer entered into a contract with the United States by which it was to " * * * furnish all necessary material, labor, equipment, power, accessories, facilities * * * necessary for accomplishing the work * * * " and " * * * place proper safeguards for the prevention of accidents and * * * put up and keep at night suitable and sufficient lights where necessary during the prosecution of the work." The contract also provided that Pioneer was to "indemnify and save harmless" the United States from all suits to which it might be subjected "arising or growing out of the fault or negligence" of Pioneer or its subcontractor.[1]

Thomas E. Byrne, Jr., Philadelphia, Pa. (Gerald A. Gleeson, U. S. Atty., Joseph J. Murphy and Krusen, Evans & Shaw, Philadelphia, Pa., on the brief), for United States.

Milton M. Borowsky, Philadelphia, Pa. (Freedman, Landy & Lorry, Philadelphia, Pa., on the brief), for Read.

Howard R. Detweiler, Philadelphia, Pa. (Frank R. Ambler, Philadelphia, Pa., on the brief), for Columbia Casualty Co., intervenor.

J. Webster Jones, Philadelphia, Pa., for appellants John Nicholas Vassilopoulus et al., on the brief.

1. The contract between the United States and Pioneer provided, in pertinent part, as follows:

"*Article 4. Performance.*

"(b) The Contractor shall furnish all necessary material, labor, equipment, power, accessories, facilities, and such other things as are necessary for accomplishing the work specified in the job order.

"*Article 9. Plans, Specifications, and Manner of Doing Work.*

"(f) The Contractor shall place proper safeguards for the prevention of accidents, and shall put up and keep at night suitable and sufficient lights where necessary during the prosecution of the work and use its best efforts to prevent accidents or injury to persons or property.

"(m) The Contractor shall indemnify and save harmless the Government and its agencies and instrumentalities, the vessel and the owner of the vessel from all suits or actions and damages or costs

The United States, owner and operator of the SS Langdon Cheves, a Liberty type merchant vessel, desired to transform her into a troop carrying vessel. Pursuant to the provisions of the contract, it notified the contractor to make the necessary repairs and alterations on the vessel.

One of the many items of repair was the conversion of four deep tanks, which had formerly carried salt water ballast, into fresh water tanks. The subcontractor was assigned to perform the conversion. The work was to begin on May 23, 1944, and the United States requested that it be done before 6:00 a.m. on May 28, 1944. The four deep tanks were directly beneath the No. 1 hold—the floor of the hold, which was approximately thirty feet below the level of the main deck; forming the ceilings for the tanks. The tanks were known as the numbers 1 and 2 starboard deep tanks and the numbers 1 and 2 port deep tanks. The two tanks nearest to bow were the number ones, and the two adjacent to them the number twos. Two walkways, forty inches wide and intersecting each other at right angles, separated the tanks from each other. A vertical steel ladder was located along the inner edge of each tank.

On May 23, 1944, the libellant was working on board the vessel. He started work at 8:00 a.m. This was the first time he had ever worked aboard a Liberty type merchant vessel. While libellant was working on the main deck during the day, other employees of South Philadelphia had removed the covers of the four deep tanks in the No. 1 hold. After supper, the libellant returned with other workmen to work overtime in the deep tanks, never having been below before nor having any acquaintanceship with the location of the deep tanks. It had begun to rain, and the hatches were covered with tarpaulins, cutting off the natural light. Upon going to work it was discovered that there was but one cluster light in the hold, consisting of a metal reflector and four bulb sockets attached to an ex-

tension cord forty-five feet long, and before the libellant and the other employees descended into the No. 1 hold, the foreman ordered libellant to obtain additional cluster lights from the officer in charge of the vessel, but the libellant was informed by the relief mate that none were available. The libellant went to work stripping lumber from the side of No. 2 port deep tank. The portable cluster light hung face down in the tank and provided sufficient illumination inside the tank, but very little on the outside except the indirect light coming from the tank opening, as there was no light on the deck immediately above the tanks.

At 11 p.m. the libellant received permission from the foreman to leave the tank. He ascended the ladder and reached the walkway between the No. 2 tanks where he was unable to see anything about him because his eyes had not yet accommodated themselves to the darkness in the hold, and after he had taken a number of steps to the bow of the vessel, he fell into the No. 1 port deep tank, suffering severe injuries.

The District Court concluded that the United States was at all times in control of the vessel; that it owed a duty to libellant to provide him with a reasonably safe place to work, which duty could not be delegated or contracted away; that after having been given notice in which to act within a reasonable time the United States was negligent in that it failed to provide sufficient lighting facilities in the No. 1 hold of the vessel; and that failing to provide sufficient lighting facilities, it was also negligent either in failing to provide safeguards around the open deep tanks, or to warn the libellant that the deep tanks were uncovered. The Court concluded that the subcontractor was negligent in failing to warn libellant of the layout of No. 1 hold and that the covers of the tanks were removed. It found that the libellant was negligent, and that negligence of the United States, the subcontractor, and the libellant were

of every name and description to which the Government and its agencies and instrumentalities, the vessel or the owner thereof may be subject or put by reason of injury (including death) to the person or property of another arising or growing out of the fault or negligence of the Contractor or any subcontractor, its or their servants, agents or employees."

concurrent proximate causes of the accident, and that 50% of the libellant's damages were attributable to his own negligence. It found that Pioneer breached its contractual duty to the United States to provide suitable lighting facilities and proper safeguards around the tanks. The Court therefore held that the libellant was entitled to recover $16,215.68 damages from the United States; the United States was entitled to recover from the subcontractor that amount which the subcontractor would have been required to pay the libellant under the Longshoremen's Compensation Act, 33 U.S.C.A. § 901 et seq., had he elected to receive compensation under the Act; and that the United States was entitled to recover the difference between $16,215.68 and the amount the subcontractor would pay it, from Pioneer, according to Pioneer's liability under the contract.

From this decree the United States appeals, contending it is not liable to Read, and if it is, it is entitled to indemnity from the contractor by operation of law and not merely on the basis of their contract.[2] Read contends that there is no basis for the finding that he was contributorily negligent, and even if 'there is, there is no basis for finding that his negligence was a 50% contributing cause of his damages. South Philadelphia, the subcontractor, appeals, contending that there is no right of contribution against it.

■■ Preliminarily, it must be kept in mind that an appeal in admiralty partakes of a trial de novo and serves to vacate the decree of the district court; that the findings of the latter when supported by competent evidence are entitled to great weight and that such findings should, therefore, not be set aside on appeal except upon a showing that they are clearly wrong. Crist v. United States War Shipping Administration, 3 Cir., 1947, 163 F.2d 145, 146. We have reviewed the record and we find that all the pertinent findings of fact of the District Court are supported by it.[3]

It may be noted that the District Court's finding that there was only one cluster light in the No. 1 hold and that it afforded very little illumination outside the tank was supported by the testimony of Read, Georgio, Coffield and two other fellow workment, Gazetos and Clayton. While Roach, defendant's witness, testified that visibility was good, his testimony was impeached by a prior written statement made shortly after the accident that visibility was very poor. Georgio testified that he went down to the No. 1 hold to obtain a hammer and that it was so dark he had to have someone from the deck throw a flashlight beam so that he could see where he was going.

In addition to the facts as found by the District Court, we find that when the libellant, together with other workmen, was about to descend into the No. 1 hold and into the deep tanks, there were two or three cluster lights with extension cords lying on the main deck. They tried to plug them in, but because the sockets were in some way defective, none of them would work. Read testified that " * * * the socket that was on the end of these here extensions must have been broke, because the one I tried was broke, and somebody else tried one and it wouldn't work, it wouldn't go into this place on the side of this here house." Georgio said he saw someone try to "plug in" the sockets on the extension cords but "they wouldn't work". Coffield testified to the same effect.

■■ In our view, it is unnecessary to discuss the issue of negligence on the part of the vessel because, irrespective of that issue liability may be predicated on the ground of unseaworthiness. It has been settled law since The Osceola, 1903, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760. "That

---

2. Pioneer, the contractor, is now bankrupt. It is insured by the intervenor, Columbia Casualty Company, against liability, except liability assumed by contract.

3. The finding that the United States was in control, for reasons discussed later in this decision, we do not consider pertinent. The libellant contends the District Court erred in finding that the employees of the subcontractor, and not the United States, removed the tank tops. That finding too is not pertinent to the disposition of the case, and the result must be the same no matter who removed them.

the vessel and her owner are, both by English and American law, liable to an indemnity for injuries received by seamen in consequence of the unseaworthiness of the ship, *or a failure to supply and keep in order the proper appliances appurtenant to the ship.*" 189 U.S. at page 175, 23 S.Ct. at page 487 (emphasis supplied). Carlisle Packing Co. v. Sandanger, 1922, 259 U.S. 255, 259, 42 S.Ct. 475, 66 L.Ed. 927; The Arizona v. Anelich, 1936, 298 U.S. 110, 56 S.Ct. 707, 80 L.Ed. 1075; Mahnich v. Southern S.S. Co., 1944, 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561. In Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85 at page 94, 66 S.Ct. 872 at page 877, 90 L.Ed. 1099, it was held that the warranty of seaworthiness " * * * is essentially a species of liability without fault * * *" and such liability " * * * is neither limited by conceptions of negligence nor contractual in character. * * * It is a form of absolute duty owing to all within the range of its humanitarian policy."

The Sieracki case also specifically stated that the vessel's obligation of seaworthiness extends to stevedores while working aboard the ship. In Hawn v. Pope & Talbot, Inc., 3 Cir., 1952, 198 F.2d 800 we held that the vessel's liability for unseaworthiness extended to a carpenter employed by one having a contract to repair the ship—as in the instant case.

On the score of unseaworthiness we have already found that there were two or three defective lighting appliances on the main deck which the libellant and other workmen tried to use but could not. From that testimony it is reasonable to infer that these appliances were defective at the time the ship was turned over to the subcontractor since there is no evidence that those lights had been used by anyone during the day. Clearly then, there was here a "failure to supply and keep in order the proper appliances appurtenant to the ship." The Osceola, supra.

We conclude, therefore, that there was a breach of the shipowner's warranty of seaworthiness.

There was no appeal taken by the libellant from the District Court's finding that he was contributorily negligent and that his negligence was a 50% contributing cause of his injuries, but he contends in his brief that the conclusion is erroneous. After finding that the lights on the main deck were defective, libellant descended into the hold, although he knew that there was only one cluster light there. On that score it should be noted that the defense of assumption of risk was not raised, as of course it could not be. for traditionally it was never a defense to actions for breach of the warranty of seaworthiness. The Arizona v. Anelich, supra. At about 11 o'clock libellant ascended the ladder in the deep tank and stepped on to the walkway in the hold. He could not see, but he nevertheless began walking until he fell into the deep tank. It is true that he did not know the lay-out of the hold or that the covers of the other tanks were removed, but it could hardly be said that in walking in an area with which he was totally unfamiliar, when he admittedly could not see in front of him, he was acting as a reasonable man under the circumstances. We are of the opinion that the damages against the United States were properly mitigated by 50% because of libellant's own careless conduct.

The District Court's conclusion that South Philadelphia was negligent in failing to warn libellant of the lay-out of the hold or that the tank covers were removed is entirely warranted by the record, but we cannot subscribe to its further conclusion that South Philadelphia should be liable over to the United States to the extent it would be liable to the libellant under the Longshoremen's Compensation Act had libellant chosen to proceed under it, for the Supreme Court has decided otherwise, subsequent to the District Court's ruling. Halcyon Lines v. Haenn Ship Ceiling & Refitting Corporation, 1952, 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318.

As to the District Court's further conclusion [4] that Pioneer breached its con-

4. Paragraph 13, Conclusions of Law.

tractual duty to the United States by failing to (1) provide adequate lighting facilities, (2) place proper safeguards around the open tanks and (3) warn the libellant of such conditions, we are of the opinion that such conclusion was factually and legally correct and must be sustained.

The District Court additionally concluded that Pioneer, under the specific indemnity provisions of its contract[5] was required to pay the United States[6] such amount as the latter was ordered to pay to the libellant. This additional conclusion has been made the subject of considerable argument here by the parties. The reason for the latter arises out of the fact that Pioneer is bankrupt and satisfaction of any judgment against it can be available to the United States only via a contractor's liability insurance policy issued by the Columbia Casualty Company, which was granted permission to intervene in the appeal of the United States.[7]

It must immediately be noted that we are not concerned here with the respective rights or obligations of Pioneer, Columbia or the United States under the policy. The policy played no part in the determination of the issues presented to the District Court.

The United States contends that it is entitled to "indemnity by operation of law and not merely on the basis of the written contract" and Columbia urges that the only basis of Pioneer's liability over to the United States is the indemnity provision in its contract. We do not subscribe to either of these contentions.

Pioneer did not appeal from the judgment of the District Court, and as we have already stated, the latter's conclusion that it had breached its contractual duty by failing to provide adequate lighting facilities, place safeguards and warn the libellant of existing dangers, was factually and legally correct.

■ "The fundamental theory is that where a person has a non-delegable duty with respect to the condition of his premises or vessel but has made a contract with another to perform that duty, and the other performs it negligently so as to make the owner liable to a person later injured, then, as a matter of implied contract, the owner is entitled to restitution from the other for reasonable damages paid the injured person." Barber S.S. Lines, Inc., v. Quinn Bros., Inc., D.C.D.Mass.1952, 104 F.Supp. 78, 80. See Restatement, Restitution, § 96.

■ Pioneer contracted to furnish adequate lights and did not, even after it was found there was only one light in the entire hold and that other lights belonging to the ship would not work, and for that breach alone of its contract, the United States is entitled to its judgment against Pioneer, independent of any express provision for indemnity in the contract. "It is immaterial that there was no express provision for indemnity in the contract between these parties." Burris v. American Chicle Co., 2 Cir., 1941, 120 F.2d 218, 222.[8]

The mere circumstance that the contract also contained an express provision for indemnity was not in any sense the dispositive factor in establishing the right of the United States against Pioneer arising out of the breach of its contractual duty—above described.

For the reasons stated the judgment of the District Court against the United States will be affirmed; the judgment in favor of the United States against the additional respondents, John Nicholas Vassilopoulus, Louis Brodsky, Leonard Barone

---

5. Subsection (m) of Article 9 of the Contract set forth in Note 1.

6. Paragraph 16, Conclusions of Law.

7. Under the terms of this policy, we are told, Columbia undertook to pay on behalf of Pioneer, all sums which the latter should become obligated to pay by reason of the liability imposed upon it by law for damages because of bodily injury caused by accident. The policy is said to expressly exclude coverage for "liability assumed by the insured under any contract or agreement or liability of others assumed by the insured under any contract or agreement." The policy, it may be noted, is not part of the record.

8. For an excellent discussion on the various bases for indemnity in cases similar to this, see Marra Bros., Inc. v. Wm. Spencer & Son Corp., 2 Cir., 1951, 186 F.2d 134, 138.

and Charles Barone, Co-Partners Trading as South Philadelphia Boiler Cleaning Company, will be reversed and the judgment in favor of the United States against the additional respondents, Joseph R. Williams and Anna Mills, also known as Anna Heffron, Co-Partners Doing Business as Pioneer Engineering Company, will be amended in amount so as to read "in the sum of $16,215.68" together with costs and interest, etc., in conformity with this opinion.