CRAWFORD v. POPE & TALBOT, Inc. et al.

LUCIBELLO v. POPE & TALBOT, Inc. et al.

Nos. 10820, 10821.

United States Court of Appeals
Third Circuit.

Reargued June 8, 1953.

Decided Sept. 3, 1953.

786

Philadelphia, Pa., on the brief), for appellees Robert J. Crawford, and Anthony Lucibello.

W. Wilson White, Philadelphia, Pa. (Thomas Raeburn White, Jr., White, Williams & Scott, Philadelphia, Pa., on the brief), for appellee Cecelia O. Jeffries, individually and trading as National Boiler Cleaning Co.

Before BIGGS, Chief Judge, and GOODRICH and STALEY, Circuit Judges.

BIGGS, Chief Judge.

Robert J. Crawford and Anthony Lucibello brought separate libels in the court below against the respondents, Pope and Talbot, Inc., and General Engineering Works. Each libellant sought indemnity for injuries caused by the alleged negligence of the respondents and by the unseaworthiness of the vessel the "Russell R. Jones" upon which the libellants were working at the time of their injuries. The "Jones" was under bareboat charter to the respondent Pope and Talbot. The answers of both respondents denied negligence and unseaworthiness and set up the negligence of the libellants as the sole cause of their injuries. The cases were tried together by the court below. During the trial the libels were dismissed as to the respondent General Engineering Works, a welding company employed by Pope and Talbot to repair the vessel's tanks. No appeal was taken from this order. A petition by the respondents to implead Cecelia O. Jeffries, individually and trading as the National Boiler Cleaning Company, as an additional respondent was granted, but this petition was later dismissed on the motion of the impleaded respondent on the ground that at the time of libellants' injuries she was their employer, was subject to the provisions of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 901 et seq., and was therefore not subject to joinder.

The court below determined that the respondent Pope and Talbot was negligent, that its chartered vessel was unseaworthy and that the libellants were not guilty of contributory negligence. The court therefore awarded damages in the amounts of

Mark D. Alspach, Philadelphia, Pa. (Robert Cox, Springer H. Moore, Jr., Krusen, Evans & Shaw, Philadelphia, Pa., on the brief), for appellant.

Charles Lakatos, Philadelphia Pa. (Wilfred R. Lorry, Freedman, Landy & Lorry,

$8,500 to Crawford and $45,000 to Lucibello. No interest or costs were given. D.C.E.D.Pa.1952, 103 F.Supp. 414, 411. Pope and Talbot appeals from these orders, and from the order of the court below granting the motion to dismiss its petition to implead Cecelia O. Jeffries as an additional respondent. We will treat these appeals, Nos. 10,820 and 10,821, together.

After a comprehensive review of all the testimony we find the facts substantially as they were found by the court below. Insofar as pertinent to our disposition of these appeals, they are as follows:

At the time of the libellants' injuries the respondent Pope and Talbot was operating the Jones under bareboat charter. The ship had engaged the National Boiler Cleaning Company to clean the accumulated rust and dirt from the four deep tanks at the bottom of No. 1 hold, and on the morning of February 10, 1950, the libellants, employees of National came aboard the ship at her pier in Philadelphia to begin this work. The Jones was a Liberty ship. Her deep tanks in No. 1 hold filled the area beneath the deck of the lower hold, two on the port side and two on the starboard. Those tanks nearest the bow were the number ones, port and starboard; those farther aft, the number twos. The tanks were twelve to fifteen feet deep and were separated by steel bulkheads, fore and aft and athwartship. Each tank had an opening above, eight by fourteen feet, around which was a ledge, three inches high and four inches wide, containing bolt holes used in securing the tank covers. Between the ledges of the tank openings there were two walkways about two feet wide which intersected at right angles. At the bottom of each deep tank were coiled steam pipes affixed to the floor of the tank.

The customary procedure in cleaning the deep tanks was to open, clean and recover one tank at a time. Because a tank cover, which weighed about one ton, could not be removed or replaced by hand, it was necessary to open the hatches above the lower hold and to employ a leader from the ship's winch on deck. But loading operations, requiring the use of the winch and the closing of the hatch from the lower hold to the 'tween decks of No. 1 hold, had been scheduled for February 10th and succeeding days. The covers of all four deep tanks were therefore removed by National on the evening of February 9th and stowed, two on each side, in the space between the deep tank openings and the hull. The hatch from the lower hold to the 'tween decks was then closed. While libellants were working in the deep tanks, and up until the time of their injuries, stevedores were loading the 'tween decks area of No. 1 hold, and the winch was unavailable for moving the deep tank covers. The libellants entered and left the lower hold by an escape hatch. Wooden ladders were used in getting in and out of the tanks.

With the 'tween decks hatch closed, it was dark in the lower hold. National therefore procured cluster lights from the ship to illumine the hold and provided its own individual extension lights for use in the deep tanks. These lights drew their current from connections at the mast house on the main deck. Because the number of these connections was limited, National used "spider boards," plugging into a single connection but providing outlets for six to eight individual extensions. The use of these "spider boards," either alone or in conjunction with other electrical apparatus connected at the mast house, caused the mast house fuse or fuses to blow at irregular intervals on February 10th, 11th and 12th; the cluster lights and the individual extensions then went out. National's men stayed still during these periods of darkness until one of their number, stationed at the masthouse, had installed a replacement fuse furnished by the ship's engineer.

Crawford began work on February 10th in the number two starboard deep tank, and Lucibello, in the number two port deep tank. The work on these tanks was completed on February 11th, and they were then wiped down with a kerosene solution. Crawford next moved to the number one port tank and Lucibello to the number one starboard tank. Throughout their period of work there were no guard rails around the tank openings. Libellants used the narrow walkways between the tanks in moving from one tank to another.

Some time during the afternoon of February 12th the ship ran steam through the pipes at the bottom of the number two tanks. This caused the kerosene to vaporize and create acrid fumes. National's employees, working in the number one tanks, were unaware of this condition. At about 7 P.M. when National's men stopped work for dinner, Crawford was one of the first to leave his deep tank. As he reached the top of the wooden ladder to the lower hold, he found that the cluster lights illuminating the lower hold had gone out although the extension lights inside the tank were still burning. The kerosene fumes irritated his eyes. Crawford called for an extension light, but receiving no answer, he edged away from the ladder into the darkness to avoid being bumped by men ascending the ladder behind him. His toe struck the ledge of the number two port tank, and Crawford pitched forward into that tank, landing unconscious on the steam pipes at the bottom.

Word of the accident was passed above, and the stevedores loading the 'tween decks area removed part of the hatch cover to lower a metal basket attached to a leader from the ship's winch. Meanwhile, Lucibello had emerged from his deep tank and was assisting, by the light of an extension bulb secured from one of the tanks, in lifting Crawford from where he had fallen and placing him on the walkway between the port and starboard tanks. Someone called to Lucibello to watch out for the basket being lowered for Crawford. At about the same time all the lights went out. Lucibello took an instinctive step sidewise or backwards and fell into the same tank from which Crawford had just been taken. Both men sustained serious injuries requiring extended hospital care. There is no dispute that the injuries of which libellants complain were caused by their falls into the deep tank; nor are the damages awarded challenged as excessive.

■ The first ground upon which the libellants seek to establish the respondent's liability is that the Jones was unseaworthy, and that this unseaworthiness caused the libellants' injuries. As in every case of alleged unseaworthiness, we must determine what showing is required to prove unseaworthiness and in whose favor the doctrine applies. The basic elements of the doctrine are now well settled. Ever since The Osceola, 1903, 189 U.S. 158, 23 S.Ct. 483, 487, 47 L.Ed. 760, it has been the law that "the vessel and her owner are * * * liable to an indemnity for injuries received by seamen in consequence of the unseaworthiness of the ship, or a failure to supply and keep in order the proper appliances appurtenant to the ship." The disjunctive used above must be regarded as introducing a further explanation of the nature of unseaworthiness, for several of the cases to which The Osceola referred involved "not providing proper appliances, so that the case was one * * * of unseaworthiness." See also Mahnich v. Southern S.S. Co., 1944, 321 U.S. 96, 100, 64 S.Ct. 455, 88 L.Ed. 561. The Supreme Court in Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 94–95, 66 S.Ct. 872, 877, 90 L.Ed. 1099, stated that unseaworthiness describes "a species of liability without fault, * * * neither limited by conceptions of negligence nor contractual in character. * * * It is a form of absolute duty owing to all within the range of its humanitarian policy." The Sieracki case broadened the range of this policy to include stevedores engaged in loading a vessel. The Supreme Court reasoned that the performance of ship's work from which arise the same risks borne by seamen entitles stevedores to the seaman's historic protection under the doctrine of unseaworthiness.

■ The court below predicated unseaworthiness upon the inadequacy of the ship's lighting system, an inadequacy known to the ship over a period of forty-eight hours before the accidents and brought home to the ship's engineer.[1] Unseaworthiness of the Jones therefore is not

1. The evidence shows that it was necessary for a member of the cleaning party, viz., a member of National's force, to obtain a box of fuses from the ship's engineer and stand in the masthouse and replace fuses as they blew out from time to

excusable within the doctrine of Cookingham v. United States, 3 Cir., 1950, 184 F.2d 213.

The lighting system was defective. The court below found (Finding of Fact No. "10"): "The electrical current for all lights was supplied by the ship. The marine connections for lights for both the No. 1 and No. 2 holds are located at the masthouse * * * four outlets are provided for each of the two holds, two each on the port and two each on the starboard. Each cluster light used must be connected to one of these outlets. The fuse box is also located in this masthouse." The record in the instant case is somewhat insufficient in that it does not show adequately by diagram or otherwise the electrical connections between the masthouse fuse box and the outlet plugs in the masthouse or the fuse set-ups. It is to be noted that in the testimony references are made to replacing both a fuse (singular) and fuses (plural) when the cluster lights and the extension lights from the spiderboards went out simultaneously, as they did from time to time. But when the accident happened, as we have stated, the cluster lights had gone out although the extension lights inside the tank were still burning. It is clear that the cluster lights and the spiderboards were on different lines attached to separate plugs in the masthouse. It is conceivable, in view of the almost immediate going out of all of the lights in the hold, that there was some electrical phenomenon of "feed-back" through fusion of metal in the fuse box itself. We are not inclined to indulge in speculation as to electrical theory whereby some lights remained on and others went out at the time of the accident. It should be observed that the fuse or fuses had been blowing out from time to time on the preceding Friday and Saturday and that blowouts also occurred on Sunday morning. In view of all the circumstances it is reasonable to infer that a failure of a fuse or fuses caused the cluster lights to go out just prior to the accident, and the extension lights subsequently went out because of the same failure. Obviously, both sets of lights were needed or they would not have been set up and such strenuous efforts have been made to keep them in operation.

■ It is clear that a failure of lighting was the cause of each accident. We base liability on this ground, which is that of unseaworthiness of the vessel.

The unseaworthiness of the ship as to Lucibello need not be dilated upon here. At the most critical moment in the rescue of Crawford all the lights went out and Lucibello was injured for this reason.

In view of what we have said it is unnecessary to discuss any other ground of liability against the ship or Pope and Talbot.

■ As to the question whether Crawford and Lucibello under the circumstances at bar were libellants in whose favor the doctrine of unseaworthiness should apply, we have no doubt that they were. Their work in the deep tanks was clearly "ship's work" within the meaning of the Sieracki case. At the very time Crawford and Lucibello were engaged in cleaning the deep tanks in No. 1 hold, seamen of the ship were similarly engaged in the deep tanks in an adjoining hold. Had one of those seamen been injured under circumstances like those before us, he would clearly have been entitled to recover for unseaworthiness of the ship. We see no reason for differentiating the situation of the present libellants. Moreover, as our discussion of the unseaworthiness of the Jones has indicated, the safe and successful completion of Crawford's and Lucibello's work was closely dependent upon the cooperation of the ship in furnishing needed appliances. This dependence supports our conclusion that the doctrine of unseaworthiness covers the injured parties here.

Because of the conclusions above stated it is irrelevant to decide whether the ship was negligent under the circumstances at bar. We base our conclusions solely upon the unseaworthiness of the Jones as demonstrated by the evidence.

---

time. Knowledge of the ship of the defective lighting and the ship's defective appliances in this regard is therefore completely demonstrated by the evidence. We so find.

strated by the circumstances of the case at bar. Cf. Mahnich v. Southern Steamship Co., and Cookingham v. United States, both supra, Hawn v. Pope & Talbot, Inc., 3 Cir., 1952, 198 F.2d 800, certiorari granted, 345 U.S. 990, and the majority and dissenting opinions in Bruszewski v. Isthmian Steamship Co., 3 Cir., 1947, 163 F.2d 720, 722. Cf. also Brabazon v. Belships Co., Ltd., 3 Cir., 1953, 202 F.2d 904.

■ The opinion of the court below decides, without discussion, that libellants were free of contributory negligence. We think that we should discuss this issue. Immediately before Lucibello fell he was in a dangerous position on the walkway between the tank openings because he had assisted in raising Crawford from the number two port deep tank. When someone called to him to look out for the basket being lowered for Crawford, he scrambled to get out of the way as the entire hold went dark. Perhaps he moved too quickly, but we cannot find that his instinctive action amounts to contributory negligence under the circumstances.

■ Crawford's situation was, however, somewhat different. We have held that a tank cleaner who leaves a deep tank and steps out upon the walkway in darkness and in ignorance of the layout of the hold and of the fact that adjoining tanks are uncovered does not act as a reasonable man should. See Read v. United States, 3 Cir., 1953, 201 F.2d 758. It must be conceded that Crawford was familiar with the layout of the hold. He had worked there three days. He knew all four deep tanks were uncovered. There had been previous lighting failures during which it had been the usual practice for National's men to stay still until light was again provided. Crawford was tired, grimy and anxious to get home and his request for an extension light went unheeded. But Read's situation was substantially similar in these respects. The first distinction between the two cases is that Crawford feared being bumped by the man ascending the ladder behind him. Read did not entertain such a fear. There is another difference, however, between Read's situation and Crawford's namely, that

Crawford was subjected to kerosene fumes arising by reason of the heated pipes in the adjacent hold. The acridity of the fumes affected his eyes. Under all the circumstances we conclude that it is not proper to hold Crawford guilty of contributory negligence.

We have carefully considered the remaining issues raised by the action of the court below in dismissing Pope and Talbot's petition to implead National. This dismissal was made, as we have stated, on the ground that National was not liable to Pope and Talbot for contribution or indemnity because National, as the libellants' employer, was within the provisions of the Longshoremen's and Harbor Workers' Compensation Act. Pope and Talbot contends that the dismissal on this ground was error and that there is no other legal basis on the record before us for sustaining the ruling of the court below. The questions presented by Pope and Talbot's contentions will be treated in the following order: (1) Does the Longshoremen's and Harbor Workers' Compensation Act bar Pope and Talbot's claim against National for contribution or indemnity? (2) Does the recent decision of the Supreme Court in Halcyon Lines v. Haenn Ship Ceiling and Refitting Corp., 1952, 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318, bar Pope and Talbot's claim? (3) In reviewing the order of the court below dismissing Pope and Talbot's petition to implead National, may this court take into consideration the findings made in this case subsequent to the dismissal? (4) Are the findings made in fixing liability upon Pope and Talbot binding upon it in its attempt to state a claim for liability over against National? (5) How does the determination of this last issue apply to the facts at bar?

■ 1. Section 5 of the Longshoremen's and Harbor Workers' Compensation Act provides that the "liability of an employer prescribed in * * * this chapter shall be exclusive and in place of all other liability of such employer to the employee, his legal representative, husband or wife, parents, dependents, next of kin, and anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury or death

\* \* \*." 33 U.S.C.A. § 905. It is this section which National contends bars Pope and Talbot's claim for contribution or indemnity. National points out that should Pope and Talbot be permitted recovery over against National for the amount of the judgments which it must now pay to Crawford and Lucibello—an amount greater than the amount of compensation which National would have had to pay to these two men had they elected to receive compensation—the purpose of the Act to impose limited but absolute liability upon employers would be circumvented. National's contention necessarily identifies Pope and Talbot as a party "otherwise entitled to recover damages from [National] \* \* \* on account of [Crawford's and Lucibello's] injury \* \* \*."

National's argument is not without force but after examining the cases which have construed Section 5 of this Act, we can accept it only in part. We conclude that National is right in contending that Section 5 does bar Pope and Talbot's claim for contribution. Authority is lacking "for saying that differences in the degrees of fault [active or passive negligence] between two tortfeasors will without more strip one of them, if he is an employer, of the protection of a compensation act; and we are at loss to see any tenable principle which can support such a result." Slattery v. Marra Bros., 2 Cir., 1951, 186 F.2d 134, 139. "To impose a non-contractual duty of contribution on the employer is *pro tanto* to deprive him of the immunity which the statute grants him in exchange for his absolute, though limited, liability to secure compensation to his employees." American Mutual Liability Insurance Co. v. Matthews, 2 Cir., 1950, 182 F.2d 322, 324. See also Lo Bue v. United States, 2 Cir., 1951, 188 F.2d 800.

▮▮▮▮ Section 5, however, does not insulate the employer from all liability to a third party from whom an employee has recovered damages. See United States v. Arrow Stevedoring Co., 9 Cir., 1949, 175 F.2d 329, 332. Liability for indemnity as distinguished from contribution, may arise from the contractual relations of the employer with the third party. Claims for full indemnity arising out of such contractual relations have *not* been considered barred by the section. See Rich v. United States, 2 Cir., 1949, 177 F.2d 688. The right to indemnity can, of course, arise by virtue of an express contract or such a right may be raised from the circumstances surrounding the contractual relationship between the employer and the third party. In either case the indemnitee has a claim which is independent of and does not derive from the injury to the employee, except in a remote sense not within the provisions of Section 5. Compare Hitaffer v. Argonne, 1950, 87 U.S.App.D.C. 57, 183 F.2d 811, 819–820, 23 A.L.R.2d 1366. We conclude that Pope and Talbot should have been permitted to implead National on its claim for indemnity insofar as Section 5 is concerned.

This construction of Section 5 is supported by those cases reaching a similar result under the almost identical language of the New York Workmen's Compensation Act, McK.Consol.Laws, c. 67, from which the Longshoremen's and Harbor Workers' Compensation Act was derived. See Westchester Lighting Co. v. Westchester County Small Estates Corp., 1938, 278 N.Y. 175, 15 N.E.2d 567; Burris v. American Chicle Co., 2 Cir., 1941, 120 F.2d 218. In the Westchester case the court said: "It may be admitted that if the defendant is held to answer to the plaintiff in this action the result \* \* \* is that an employer is made liable indirectly in an amount which could not be recovered directly. This consequence, we think, does not decide the issue against the plaintiff. Recovery over against the employer in an unusual case like this need not be rested upon any theory of subrogation. An independent duty or obligation owed by the employer to the third party is a sufficient basis for the action." 278 N.Y. at page 180, 15 N.E.2d at pages 568–569.

It follows that Pope and Talbot is not entitled to contribution from National but may be entitled to indemnity.

▮▮▮▮ The recent decision of the Court of Appeals of New York in McFall v. Compagnie Maritime Belge (Lloyd Royal) S.A., 1952, 304 N.Y. 314, 328–332, 107 N.E.2d 463, 471–473, throws an interesting

light on the present issue. That Court stated: "The right to indemnity, as distinguished from contribution, is not dependent upon the legislative will. It springs from a contract, express or implied, and full, not partial, reimbursement is sought * * *." The Court went on to say: "Here Transoceanic, the stevedoring contractor, entered into an agreement with Belgian Line [the shipowner] to perform the loading operations and it was under an obligation to do that work in a careful and prudent manner whether that duty was expressed in the contract or not." The Court also said: "Belgian Line has not urged that the stevedoring contract with Transoceanic contained an express covenant of indemnity. Nevertheless, the cases * * * establish the principle that, even in the absence of an express covenant of indemnity Belgian Line has the right to a recovery over against Transoceanic if the evidence be sufficient to establish Transoceanic as the primary wrongdoer." Finally, the Court said: "The Federal rule does not appear to be different. 'While the remedy afforded by the Longshoremen's Compensation Act is exclusive as between employer and employee, it does not nullify or alter the workman's rights as against third parties. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 102, 66 S.Ct. 872, 90 L.Ed. 1099, 1110. Nor does it bar the third party thus sued from recovering from the workman's employer damages such party is required to pay to the employee by reason of the employer's negligence. Green v. War Shipping Administration, D.C., 66 F. Supp. 393, 395; Severn v. United States, D.C., 69 F.Supp. 21; Benevento v. United States, D.C., 68 F.Supp. 347; all maritime cases involving indemnification. * * *' Barbara v. Stephen Ransom, Inc., 191 Misc. 957, 960, 79 N.Y.S.2d 438, 441, Froessel, J. To the list of cases above cited may be added the later case of Rich v. United States [supra] * * *, where the United States Court of Appeals for the Second Circuit stated that the right to indemnity exists 'despite the provisions of the Longshoremen's and Harbor Workers' Compensation Act'."

2. Pope and Talbot admits that the decision of the Supreme Court in Halcyon Lines v. Haenn Ship Ceiling and Refitting Corp., supra, prevents it from claiming contribution from National, even if Section 5 of the Longshoremen's and Harbor Workers' Compensation Act did not have this effect. National, however, goes further and contends that this decision also bars Pope and Talbot's claim for indemnity, even one based on contract. We do not agree with this contention. The core of the Halcyon case is expressed in the Supreme Court's conclusion that "it would be unwise to attempt to fashion new judicial rules of contribution and that the solution of this problem should await congressional action." 342 U.S. at page 285, 72 S.Ct. at page 280, 96 L.Ed. 318. We cannot read this conclusion as barring the enforcement of an independent claim for indemnity arising as indicated in "(1)", supra. The cases since Halcyon have recognized the difference between claims for contribution and for indemnity and have held that Halcyon bars only the former. See Barber S.S. Lines, Inc. v. Quinn Bros., Inc., D.C.D.Mass. 1952, 104 F.Supp. 78; Davis v. American President Lines, D. C.N.D.Cal., 106 F.Supp. 729, 1952 A.M.C. 818; Horan v. Pope and Talbot, D.C.E.D. Pa., 115 F.Supp. 32; Read v. United States 3 Cir., 1953, 201 F.2d 758; McFall v. Compagnie Maritime Belge, supra.

■ 3. It appears, therefore, that the court's order granting the motion was erroneous insofar as it denied Pope and Talbot the opportunity to establish its claim for indemnity. When the court below granted the motion to dismiss, it had before it only the pleadings, the petition and the motion. None of the facts had been developed. Since the court below ruled wrongly on a matter of law, must we therefore reverse its order and remand the case for further proceedings between Pope and Talbot and National, or may we look to the findings made in this case subsequent to the dismissal in order to determine whether, assuming Pope and Talbot does have a contractual basis for claiming indemnity, these findings preclude the successful prosecution by it of such a claim? If we do not consider the points just stated and remand without discussing them, the re-

mand might serve no useful purpose for the court below would be without the benefit of our views—such as they are. We conceive that National, as an impleaded third-party defendant, would merely move for summary judgment on the same ground which it now urges as a basis for sustaining the action of the court below in dismissing Pope and Talbot's petition to implead National, namely that the facts established at the trial between Crawford, Lucibello and Pope and Talbot demonstrate that Pope and Talbot has no valid claim for indemnity. The court below in deciding the motion for summary judgment would have before it the identical record which is now in this court. Should it grant the motion, we might well have an appeal which would bring the case before us once again with no additional aids or evidence in deciding the contention made by National. We therefore will now decide whether the findings made in this case subsequent to the dismissal of Pope and Talbot's petition can afford a basis for sustaining the dismissal.

4. The problem is primarily one of law—viz., whether any of the findings made in the proceedings between Crawford and Lucibello and Pope and Talbot can bind Pope and Talbot in its proceedings against a third party who was not a party to the Crawford and Lucibello trials or appeals.

Pope and Talbot might well favor a determination that the only findings binding in the future litigation of its claim for indemnity are the amounts and correctness of judgments from which it seeks indemnity. Pope and Talbot might possibly prefer to disregard all other findings necessary to the judgments. But to state this possibility is to reveal its inconsistency. Suppose, which is not precisely the situation in the instant case, for here Pope and Talbot was held liable on the ground of unseaworthiness of the vessel, a party is held liable to a plaintiff for negligence. The party then seeks indemnity from the judgment contending that the indemnitor was really the negligent cause of the original plaintiff's injury. Will the would-be indemnitee be permitted to present his judg-

ment, based on his negligence, demanding indemnity, and at the same time argue that he was not negligent at all? Other courts have thought not and we reach the same conclusion. In the indemnity litigation either the indemnitee's negligence is reexamined with the result that if the indemnitee is found not negligent then the judgment against him is considered erroneous and indemnity is denied, or the indemnitee's negligence is considered established by the original judgment and his claim for indemnity examined—though not necessarily denied—on that hypothesis. A leading example of this second approach is Union Stock Yards Co. v. Chicago, B. & Q. R. Co., 1905, 196 U.S. 217, 25 S.Ct. 226, 49 L.Ed. 453. This case accepts as its starting point the fact that the indemnitee was negligent, and negligent in a certain way, as determined by the court which gave judgment against the indemnitee.

The critical questions then are these: When will the court in the indemnity litigation permit the parties to reexamine all the facts, with the possible result that the original judgment is found wrong, thus leaving the indemnitee with nothing from which he can properly claim indemnity? And when will the court consider the indemnitee and the indemnitor bound by the findings made in establishing the original judgment?

 The general rule is clear. A person not a party to a case is not bound by the findings of that case in subsequent litigation involving the same fact situation. Where the subsequent litigation involves one of the same parties to the original case, even that party is not bound since his adversary, the new party, is not. This principle has been said to apply to claims for indemnity. In George A. Fuller Co. v. Otis Elevator Co., 1918, 245 U.S. 489, 491, 38 S.Ct. 180, 181, 245 U.S. 489, Mr. Justice Holmes stated: "But there were no facts, whether adjudicated in the former case or not, that were not open to the consideration of the jury in this [the indemnity litigation]. The Otis Company [the indemnitor] was joined as a party defendant, it is true, in the former action, and a verdict was directed in its favor. But even

if the former verdict against the petitioner [the indemnitee] had gone on the same issue that was tried in the present case, which was not the fact, it could not have concluded the petitioner in favor of the Otis Company, for the reason, if for no other, that the Otis Company was dismissed from the suit before the petitioner's evidence was heard."

We can find no substantial authority indicating that Mr. Justice Holmes' statement is no longer the law in indemnity cases. The cases cited by National for the broad proposition that any party suing for indemnity from a judgment is estopped to challenge the findings on which the judgment was based do not support the proposition. Fidelity & Casualty Co. of New York v. Federal Express, 6 Cir., 1943, 136 F.2d 35, 39, while using broad language, actually concerned indemnity litigation between two parties who had been co-defendants *throughout* the proceedings which had resulted in the judgment from which indemnity was sought. The court held that the indemnitee and the indemnitor were bound by the findings in the earlier case because they were both parties to it and had actively participated in the defense. Builders Supply Co. v. McCabe, 1951, 366 Pa. 322, 77 A.2d 368, 24 A.L.R. 2d 319, cited for its comprehensive review of state and federal authorities, was an indemnity case in which it was found that the indemnitor had been given notice of the original proceeding against the indemnitee and had been invited to assume the defense. Since the indemnitor had not entered an appearance and had left the defense to the indemnitee, both indemnitee and indemnitor were held bound by the findings necessary to the judgment against the indemnitee.

These two cases are typical. The first is merely an elaboration upon the general rule stated above. The second may more properly be called an equitable exception to the general rule. The views of each case have been written into the Restatement of Judgments. See Sections 106, 107(a). Comment c to Section 107(a) provides: "*Rationale.* Where a person is under a duty to another to indemnify the other against losses suffered as the result of a breach of contract or for a tort, the indemnitor is entitled to a trial to determine whether his liability has come into existence. He may or may not be under a duty to the indemnitee to defend the action against the latter and if he is under no such duty he commits no breach by failing to defend. In this event he is entitled, in the subsequent action against him for indemnity, to show that the indemnitee was not subject to liability and hence not entitled to indemnity." The rules stated in the Restatement of Judgments are also set forth in the Restatement of Restitution. See Section 76, *Comment f,* and Section 78, *Comment e.*

We conclude that the answers to the questions posed above are as follows. If the indemnitor was not a party to the original action against the indemnitee, and where he was under no duty to participate in the defense of the original action, or where, being under such a duty, he was not given reasonable notice of the action and requested to defend, neither the indemnitor nor the indemnitee is bound in subsequent litigation between them by findings made in the action. Where, on the other hand, the indemnitee and the indemnitor are co-defendants actively participating in the defense of the original action, or where the indemnitor, with notice of the action and of the indemnitee's request that he defend it, does not participate in the defense but leaves it to the reasonable efforts of the indemnitee, then in subsequent litigation between them both indemnitor and indemnitee are bound by the findings necessary to the judgment in the action.

5. In the instant case there can be no question but that Pope and Talbot notified National of Crawford's and Lucibello's actions against it by endeavoring to implead National as a third party defendant. However, National took the position that under the Longshoremen's and Harbor Workers' Compensation Act, it could not be sued for contribution or indemnity. Although this view was mistaken as to the indemnity claim, the court below sustained it and prior to the trial dismissed the petition to implead National.

National, therefore, as far as it could know, was under no duty to participate in the defense of the actions against Pope and Talbot. We conclude that National cannot be bound by any of the findings made in the litigation between Crawford and Lucibello and Pope and Talbot. Compare the strikingly similar fact situation in George A. Fuller Co. v. Otis Elevator Co., supra. Should Pope and Talbot now press its claim for indemnity against National, it will be open to National to establish that Pope and Talbot was erroneously held liable to Crawford and Lucibello, and that therefore Pope and Talbot may not claim indemnity from this judgment. We think it must follow that if National is free to relitigate all the facts of the situation at bar, Pope and Talbot cannot be bound by the present findings as to these same facts.

We cannot decide on the present record whether National may be held liable to indemnify Pope and Talbot. See Barber S.S. Lines, Inc. v. Quinn Bros., Inc., supra 104 F.Supp. at pages 80–81; Restatement of Restitution, Sections 76–78, 95. We leave this issue to be litigated by the parties in the light of the principles which we have set forth above.

One further request, this by the libellants Crawford and Lucibello, must be dealt with. The libellants asked for interest and costs in the court below. The trial court did not grant these requests. It had not, at the time of these appeals, taken any action in respect to them. There is some question whether this omission by the court below was inadvertent. We will not therefore ourselves decide whether this is an appropriate case for the award of interest and costs in the court below, but following the procedure recently employed by this court in dealing with an identical question in Brabazon v. Belships Co.,[2] supra, we will reserve to the libellants the right to make application in the court below for amendment of the judgment to include interest and costs in that court following the issuance of our mandate. In the exercise of our own legal discretion, however, we may state that we can perceive no reason why the libellants should not have the costs of these appeals, viz., their costs in this court.

No costs in this court will be allowed National or Pope and Talbot.

The judgments of the court below in favor of the libellants Crawford and Lucibello against Pope and Talbot will be affirmed with costs in this court to the libellants. The order of the court below dismissing Pope and Talbot's petition to implead National on its claim for indemnity will be reversed and the case remanded for further proceedings consistent with this opinion.

---

2. See the order of this court of April 10, 1953. The matter is not referred to in the opinion.