Lutz RUHE, Libellant,

v.

NORTH GERMAN LLOYD LINE, Respondent.

No. 20718.

United States District Court
E. D. New York.

Oct. 5, 1959.

Jacob Rassner, New York City, for libellant.

Alexander, Ash & Schwartz, Sidney A. Schwartz, Joseph Arthur Cohen, New York City, for respondent.

**J. SKELLY WRIGHT, District Judge.**

The Ruhe family of Alfeld-Leine, Germany, has for generations been engaged in the capture, transportation, and sale of wild animals and exotic birds. In connection with this pursuit, the present generation of Ruhes maintains a receiving station for such animals and birds near the city of New York. From all parts of the world animals and birds are shipped to this receiving station for sale and distribution to circuses, zoos, and other purchasers in the United States. On December 12, 1954, Lutz Ruhe, the young son of the dynasty, then nineteen, was injured when he fell through an open hatch on the S.S. Lahnstein while inspecting a shipment of Ruhe animals.

On December 10, 1954, the S.S. Lahnstein berthed at the 17th Street Pier, Brooklyn, New York. The Ruhe part of her cargo, consisting of fourteen animals in twelve crates, was being transported by the respondent under a bill of lading which required the shipper, Ruhe, to tend the animals. Pursuant to this agreement, libellant's brother, Heintz Ruhe, boarded the vessel with the animals in Hamburg, Germany, and tended them during the transatlantic voyage.

The twelve crates containing the fourteen animals in the Ruhe shipment were loaded in the wing of the No. 4 'tween deck, port side. The crates, as loaded, formed an "L," with seven in a fore and after line and five athwartship, the end of the athwartship line being approximately five feet from the coaming of the hatch. The only entrance to the No. 4 'tween deck was at the forward end, port side, through a door in the watertight bulkhead from the engine room. On entering the darkened 'tween deck from this door, one would first see the starboard side of the longitudinal row of crates. A cluster light,[1] attached in the forward part of the hold, was so directed. There was a second cluster which illuminated the after side of the athwart-ship row of crates. There were no other lights in the hold.

In order to inspect the animals in the crates, it was necessary to walk down the lighted starboard side of the longitudinal line, and then around the end of the L through the five-foot passage between the last crate in the athwartship line and the hatch coaming. There is a question in the evidence as to whether any part of the hatch opening itself was illuminated. It was conceded by the third mate, the only ship's officer who testified, that the after end, port side, of the hatch opening wherein Lutz Ruhe fell was not. But that witness insisted that the forward part of the opening, port side, was clearly visible under the lights.

On arrival in Brooklyn December 10, 1954, Heintz Ruhe was forced to leave the vessel because of illness. He advised the captain and the chief officer of his predicament and obtained the assurance of these officers that a crewman would be assigned to care for the animals until they could be unloaded. Heintz Ruhe also obtained permission from the captain and first officer for Lutz Ruhe and other persons connected with the Ruhe receiving station near New York to come aboard the vessel to inspect the animals and tend them, if necessary.

Pursuant to this authority, on the day the vessel arrived at Brooklyn, Lutz Ruhe was escorted to the 'tween deck of No. 4 hold by his brother, Heintz, and shown the animals. Later the same day Lutz and Heintz left the vessel. On December 12, 1954, Lutz returned to the vessel with Dr. Roth, a veterinarian employed by Ruhe, for the purpose of inspecting the animals. It was on this occasion that Lutz fell through the open hatch from the No. 4 'tween deck into the lower hold.

On December 10, 1954, when Lutz Ruhe first entered the No. 4 'tween deck, the working of cargo had not yet begun and, consequently, the hatches were closed. Because there was a bale of hay

---

1. A cluster is a reflector with several incandescent lamps. Here the reflectors were approximately two feet in diameter and nine inches deep.

blocking the passage between the hatch coaming and the end of the athwartship line of crates, Lutz Ruhe stepped up on the hatch cover in order to get around to the after side to inspect the animals there. When he came aboard two days later, on Sunday, December 12th, the holds had been opened and some of the cargo removed. Being a holiday, however, no work with cargo was then in progress. There was a canvas cover, or rain tent, on the hatch opening to No. 4 at the main deck, but the hatch opening at the 'tween deck was entirely uncovered. On this occasion, December 12th, on again encountering the bale of hay in the passageway between the hatch coaming and the crates, Lutz Ruhe again stepped up on what he thought would be the hatch cover and fell into the lower hold.

Libellant contends that, since he was at the time of his injury tending part of the cargo of the vessel, he was performing work usually performed by seamen. Consequently, he was covered by the warranty of seaworthiness. In the alternative, libellant states that in any event he was on the vessel with the express permission of the captain, and therefore, at the very least, was owed the duty of reasonable care. He alleges that the conditions in the hold under which he was required to tend the animals were unsafe and, consequently, the respondent breached the warranty of seaworthiness and failed in its duty of reasonable care.

The respondent first takes the position that Lutz Ruhe was a trespasser, that he had no authority to go aboard the vessel and, therefore, the only duty owed was that of not wilfully or wantonly injuring him. Assuming that Ruhe was rightfully on the vessel, respondent expressly denies that the warranty of seaworthiness applies to him. It further alleges that any duty of reasonable care owed Ruhe was complied with and that Ruhe was injured through his own negligence in attempting to step on a hatch cover that was not there.

■ The contention of respondent that Ruhe was trespassing may be quickly disposed of. The shipper, Ruhe, not only had the right, but the obligation under the bill of lading to have a person aboard the vessel to tend the animals. Moreover, when Heintz Ruhe became ill, the captain expressly permitted Lutz Ruhe and others to come aboard the vessel for this purpose. But respondent states that Lutz Ruhe, on the day of the accident, came aboard without again obtaining permission from the ship's officers. The testimony shows that after obtaining permission from various wharf personnel to come on the dock and board the vessel, Lutz Ruhe and Dr. Roth made known his presence to the third mate who was the duty officer at the time. There is a conflict in the testimony as to whether or not the third mate specifically told them they could go below. The third mate testified that he did not remember speaking with Lutz and Dr. Roth before Lutz was injured. He testified further, however, that if they had asked his permission to go below, he would have referred them to the captain for permission. Since Lutz already had the captain's permission, that was unnecessary. Moreover, the log of the vessel shows that Lutz and Dr. Roth did confer with the third officer prior to going into the hold. He had notice they were aboard for that purpose. Whatever resolution is made of the conflict in the testimony of Lutz Ruhe, Dr. Roth and the third mate, the unquestioned fact remains that Lutz was not aboard the vessel for a purpose inimical to the legitimate interests of her owner. He was, therefore, owed the duty of reasonable care. Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 632, 79 S.Ct. 406, 3 L.Ed.2d 550.

■ Since the respondent failed in its duty of exercising reasonable care, it is unnecessary to determine whether Lutz Ruhe was covered by the warranty of seaworthiness. The evidence shows that, at least, the part of the hatch opening into which Ruhe fell was in darkness.

It further shows that the normal passageway around the square of the hatch was blocked by a bale of hay. The third officer testified that this was a dangerous condition.[2] It was dangerous because persons seeking to get around the bale of hay would be inclined to do exactly what Lutz Ruhe did, the same as he had safely done two days before, step up on the hatch cover and then go around to inspect the crates in the after part of the hold.

Respondent, digging deep into history, has dredged up some old lower court cases [3] which hold that an uncovered unprotected hatch is not an unsafe condition. Respondent's avoidance of the later appellate cases [4] is understandable because they all hold to the contrary. It is conceivable, of course, that, under some circumstances, leaving a hatch open would not amount to negligence. For example, if cargo is being worked, or possibly if the conditions are such that the opening can be readily seen. But this accident occurred in a darkened lower hold [5] wherein the only light was directed at the animal crates, and wherein the passageway between those crates and the darkened end of the open hatch was blocked.

 Respondent's charge of contributory negligence against Lutz Ruhe is not well founded. It is argued that Lutz, admittedly, was momentarily blinded by the lights around the crates and stepped into the open hatch while unable to see. It is, of course, probable that, after being under the bright illumination from the clusters for several minutes, the eyes of Lutz Ruhe did not immediately focus in darkness. The human eye does take some time to function properly in darkness after having been exposed to light. How this phenomenon can assist respondent here is difficult to perceive.[6] Lutz Ruhe was not a seaman. And there is no proof that he was otherwise aware of the fact that his eyes would not function effectively in darkness after being exposed to light. Lutz Ruhe did exactly what any reasonable young man of nineteen, or any other age, would have done when encountering a blocked passageway. He tried to get around it by the only means which appeared to be immediately available.

 On the question of quantum, it appears that Lutz Ruhe fell 15 feet and landed on some cargo in the lower hold. In so doing, he was knocked unconscious for ten minutes and suffered compression fractures of his thoracic vertebrae, six and twelve. He was in the hospital nine days, in a plaster body cast two months, and in a body brace three months. He has been left with one vertebra diminished in size in excess of 50 per cent plus traumatically induced arthritic changes in his back. While his residual injury is neither painful nor disabling, it is sufficiently serious that he was rejected by the armed services of the United States. For his suffering and for his residual injury, this Court awards Lutz Ruhe $17,500.

There is no claim for loss of earnings or medical expenses. It is claimed, how-

2. The courts have also recognized that a blocked passageway creates a dangerous condition on a vessel. Miller v. The Sultana, 2 Cir., 176 .F.2d 203; Tide Water Associated Oil Co. v. Richardson, 9 Cir., 169 F.2d 802; Johnson v. Griffiths S.S. Co., 9 Cir., 150 F.2d 224.

3. The Louisiana, 5 Cir., 74 F. 748; The Jersey City, D.C., 46 F. 134; The Sir Garnet Wolseley, D.C., 41 F. 896; Dwyer v. National Steam-Ship Co., C.C., 4 F. 493.

4. Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143; Miller v. The Sultana, supra; Tide Water Associated Oil Co. v. Richardson, supra; Badalamenti v. United States, 2 Cir., 160 F.2d 422; Johnson v. Griffiths S.S. Co., supra.

5. Insufficient lighting is also a well-recognized dangerous condition aboard a vessel. Pope & Talbot, Inc. v. Hawn, supra; Ross v. Steam Ship Zeeland, 4 Cir., 240 F.2d 820; Pacific Far East Lines, Inc. v. Williams, 9 Cir., 234 F.2d 378; Crawford v. Pope & Talbot, Inc., 3 Cir., 206 F.2d 784; Tide Water Associated Oil Co. v. Richardson, supra.

6. See Tide Water Associated Oil Co. v. Richardson, supra.

ever, that as a result of this accident, Lutz Ruhe has undergone personality changes which amount to an anxiety neurosis. There is only one doctor, a Dr. Denker, who found this condition. The testimony of that doctor is rejected. This Court's observation of Lutz Ruhe confirms that he is a personable young man with no apparent inhibitions traceable to a neurosis resulting from this or any other accident.[7]

Decree accordingly.

John M. Hollis, U. S. Atty., W. Farley Powers, Jr., Asst. U. S. Atty., Norfolk, Va., for plaintiff.

William P. Oberndorfer, Norfolk, Va., for receiver.

---

7. Ruhe's Armed Services medical examination shows that he was in at least one prior accident in which his left arm and right leg were broken. This prior accident, or accidents, was not disclosed to Dr. Denker. Ruhe's Armed Services medical examination report also states: "No neuro-psychiatric pathology."